## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 1:21-cr-00513-RBW |
| | ) | |
| WILLIAM WRIGHT WATSON | ) | |

### SENTENCING MEMORANDUM

In the weeks leading up to the certification of the electoral college vote, **WILLIAM WRIGHT WATSON,** along with the rest of America, was inundated with talk show pundits claiming the election had been stolen.   The President of the United States, Donald Trump, did everything in his power to further that narrative.   The president's supporters, and perhaps other Americans disillusioned by the American political process, were susceptible to believing these falsehoods.   Perhaps at no other time in recent political history has an American President taken such an active part in spreading misinformation and planting the seed of mistrust among the people of this country.   President Trump's position lent an air of legitimacy to his claims of electoral fraud and abuse.

On January 5, 2021, Mr. Watson decided to drive to Washington D.C. to protest the certification and attend a rally led by none other than the President.   Mr. Watson left Auburn, Alabama with the intention to participate in something very American- a protest.   Mr. Watson wanted his voice to be heard and his presence to make a difference.   He wanted his government to know that he was displeased with the election, the process, and its results.   He wanted to support Donald Trump and be among other folks who also backed the President.

Mr. Watson and his friend Larry Freeligh drove to the nation's capital in Freeligh's Mazda

and arrived early on January 6th.   Mr. Watson and Mr. Freeligh planned to follow a schedule for the day that radio show host, Alex Jones' promoted.   Mr. Jones had suggested that the crowd meet at the Ellipse at 9:00 a.m. and then proceed to the United States Capitol building at 1:00 p.m. to protest Congress's certification of the electoral college votes.

Mr. Watson is a peaceful person and while he was vocal in his beliefs, he had no knowledge that the protest would take the turn that it made.   Mr. Watson planned to protest.   He had hoped that law makers might enter into discourse with the crowd.   Mr. Watson comes before this Court after having been found guilty of One Count of Obstruction of an Official Proceedings in violation of 18 U.S.C. § 1512(C)(2) and one Count of Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. § 1752(a)(1) and (b)(1). Mr. Watson entered the capitol building through a window that another protester broke and he entered with a can of OC spray that he had found on the ground outside and a pocket knife.

Mr. Watson requests a sentence of time served followed by a term of supervised release. Mr. Watson is amenable to any special conditions of supervised release that the Court feels is necessary to impose.

## Mr. Watson's Personal History and Characteristics

William Wright Watson was born on March 15, 1997, in Montgomery, Alabama.   His parents, Jason Watson and DeAnne Watson were thrilled to welcome their fist child.   The couple went on to have two more children; Anna Watson (22) and Grace Watson (11).   Grace was adopted from Russia by the Watsons and the entire family, including Will and Anna, were actively involved in the adoption process.

Will Watson was raised in a Christian home.   Jason Watson was an elder in the church.

Later Jason and DeAnne Watson decided to embark on a mission to distribute Christian magazines and parenting magazines.   The Watsons encouraged their children to have independent views and follow their own beliefs.   Their oldest son, Mr. Watson, questioned just about everything, including his faith.   Mr. Watson's parents gave him the freedom to ask questions and encouraged thoughtful discourse about topics that Mr. Watson found important.

Mr. Watson attended magnet schools and later a private Christian Academy.   Mr. Watson enjoys reading and learning about his various interests.   He went on to graduate with an advanced high school diploma from Alabama Christian Academy in 2015.   He attended one semester of college at Auburn University studying computer science.   He had hoped to learn how to make video games as he is an avid fan of gaming.   Mr. Watson dropped out of school after the one semester.   He later tried his hand at college courses again at Southern Union Community College in 2018 and 2019.   Ultimately, college was just not for Mr. Watson.

Aside from school, Mr. Watson worked some food service industry jobs.   He always loved cooking, but up until the time of the instant offense, he had not really dedicated himself to pursuing his goals.   Mr. Watson enjoys playing video games, lifting weights and spending time with his family.   Mr. Watson also loves animals, particularly cats.   Mr. Watson is extremely attached to his pet cats and when he speaks about his love for his cats, the emotional and tender parts of his character are on full display.

Since his arrest on the instant offense, Mr. Watson has dedicated himself to honing his craft as a chef.   Mr. Watson has worked at some of the finest restaurants in the Auburn and Montgomery areas.   Mr. Watson's former girlfriend, Nenlay Quewan gave birth to Mr. Watson's first child the last week of December 2023.   Mr. Watson's daughter, Cattaleya, was

born prematurely and weighed just 1pound and 10 ounces. Despite her premature birth, Catteleya

is growing and progressing well.



Mr. Watson is excited about the prospect of being active in his daughter's life.   He hopes

to be a loving and supportive parent and to work hard to provide his daughter with financial

stability.   Mr. Watson is intent on resuming his career in the culinary arts, becoming a chef and

making his child proud of him.

### Objections to the PSR's Guidelines Calculation

**¶ 38 Specific Offense Characteristic, USSG §2J1.2(b)(1)(B), eight-level enhancement for property damage committed to obstruct justice.**

The facts in Mr. Watson's case do not support an eight-level enhancement in this case.    The

commentary to USSG §2J1.2(b)(1)(B) and 2J1.2 generally, buttress Mr. Watson's position that his

conduct does not trigger the application of this enhancement.

This section addresses offenses involving the obstruction of justice generally prosecuted under the above-referenced statutory provisions. Numerous offenses of varying seriousness may constitute obstruction of justice: using threats or force to intimidate or influence a juror or federal officer; obstructing a civil or administrative proceeding; stealing or altering court records; unlawfully intercepting grand jury deliberations; obstructing a criminal investigation; obstructing a state or local investigation of illegal gambling; using intimidation or force to influence testimony, alter evidence, evade legal process, or obstruct the communication of a judge or law enforcement officer; or causing a witness bodily injury or property damage in retaliation for providing testimony, information or evidence in a federal proceeding. The conduct that gives rise to the violation may, therefore, range from a mere threat to an act of extreme violence.

The specific offense characteristics reflect the more serious forms of obstruction. Because the conduct covered by this guideline is frequently part of an effort to avoid punishment for an offense that the defendant has committed or to assist another person to escape punishment for an offense, a cross reference to §2X3.1 (Accessory After the Fact) is provided. Use of this cross reference will provide an enhanced offense level when the obstruction is in respect to a particularly serious offense, whether such offense was committed by the defendant or another person.  (Background Commentary, 2J1.2.)

Taken together with the commentary for the specific subsection applied to Mr. Watson, USSG §2J1.2(b)(1)(B), it is clear that the application of this guideline enhancement, is in error.

The inclusion of "property damage" under subsection (b)(1)(B) is designed to address cases in which property damage is used caused or threatened as a means of ***intimidation or retaliation*** (*e.g.* to intimidate a witness from, or retaliate against a witness for, testifying.)   Subsection (b)(1)(B) is not intended to apply, for example, where the offense consisted of destroying a ledger containing an incriminating entry.  *Commentary Note 5.*  **(emphasis added).**

The application of this enhancement must be triggered by the property damage caused by Mr. Watson.   According to the PSR, Mr. Watson helped "tear down cloth around a scaffolding so the crowd could move further up the stairs toward the capitol building." (PSR, ¶ 22).   He also entered the capitol in the Senate Wing Door area through a window that was previously broken (by someone else) and further broke an already "partially broken windowpane."

Mr. Watson helping to tear cloth appears to have occurred well before the breach of the capitol building.   That action was not committed as a means of intimidation or retaliation against anyone.   The protestors were outside of the capitol building moving closer for the purposes of protesting and addressing their grievances.   The tearing of the cloth was to allow for movement up the stairs of the capitol.   The damage to the cloth itself was not a message of intimidation or retaliation.   Similarly, Mr. Watson is not the person who initially broke a windowpane from the window leading into the Capitol Building.   Rather, he is one of many, who went through an already broken window, thereby further breaking the windowpane.   Mr. Watson's actions of causing damage to an already broken window was not done as a means of intimidation or retaliation as required by the guidelines.

Mr. Watson does not deny that he caused damage to cloth outside the steps of the Capitol Building, nor does he deny that he went through a broken window causing further damage to the already broken glass.   And while he regrets engaging in any of this conduct, there is no evidence that he damaged property "in order to interfere with the administration of justice" as required by the Guideline.

This guideline was intended to apply only when this property damage results in the most serious forms of obstruction.   To be clear, all individuals who have been found guilty of obstruction of an official proceeding cannot automatically be assessed this enhancement merely because it involved some type of property damage.   The property damage must be committed with the intent to interfere in the administration of justice and as a means of threats and intimidation.   Ransacking the office and breaking the belongings of a person who is certifying the vote of the electoral college can be interpreted as an action to intimidate or retaliate against

such a person.   Mr. Watson's actual property damage is in essence a misdemeanor property offense.   Because there is no evidence that he committed the property damage to interfere with the administration of justice and to intimidate or retaliate against anyone, Mr. Watson should not be subjected to such a substantial increase to his guideline range.   This enhancement should be applied when the Defendant's *commission of the property damage* results in the most serious form of obstruction.

The PSR also suggests that Mr. Watson can also be assessed this enhancement because Mr. Watson allegedly threatened to cause physical injury to a person because he "pointed OC spray cannister in the direction of police officers as a means of communicating (in his own words) 'don't fucking do anything to me."   Mr. Watson also stated to investigators that he was not threatening the officers, he was just showing them that he had the OC in case they decided to attack him, he was ready to defend himself."   None of these statements above regarding Mr. Watson's pointing of the OC spray at law enforcement are part of the stipulated facts found by this Court at Mr. Watson's stipulated trial.   The stipulated trial facts are that Mr. Watson entered the capitol building with the OC spray and a pocketknife.   There is no evidence in the record of this case to support this enhancement for threatened physical injury.   There is no evidence that law enforcement saw the OC spray or perceived a threat at all.

It is important to note that in assessing enhancements for specific offense characteristics, pursuant to USSG § 1B1.3 requires that the Court can consider all acts willfully caused by the defendant "that occurred during the commission of the offense of conviction in preparation for *that* offense, or in the course of attempting to avoid detection or responsibility for that offense.

The offense of obstructing an official proceeding occurred when the crowd began to enter

the Capitol Building and the certification had to be halted to evacuate members of congress and other personnel.   Mr. Watson holding up the OC spray did not occur during the commission of the offense or while inside the capitol building.   Mr. Watson was still outside in a crowd protesting and he had no idea he would eventually enter the capitol at that point to commit the offense of conviction.   He was not preparing for the commission of the offense that he eventually committed, because he did not even know at that point that he would be committing it.

**¶ 39 Specific Offense Characteristic, USSG §2J2.1(b)(2) three-level enhancement for "substantial interference with the administration of justice."**

The comments to the Guidelines addressed what constitutes a "substantial interference" with the administration of justice. Notably, each example in the commentary describes a situation in which the defendant has materially affected the *outcome* of the obstructed proceeding; for example, a prematurely terminated investigation or indictment procured through perjury. U.S.S.G. §2J1 cmt. n. 1. Here, Mr. Watson's actions had no causal relationship with the outcome or duration of the joint session. He assaulted no one and he did not encounter legislators or staff. He did not step foot in the Senate Chamber when Congress was meeting or at all. In fact, Mr. Watson, once inside the Capitol Building, was quiet and assisted police in quieting the masses.   His conduct was similar to that of Class A and B misdemeanants who entered the building and engaged in trespass or disorderly conduct. There is no factual basis for calling Mr. Watson's conduct "substantially" obstructive unless the court is prepared to conclude that every protester who entered the building committed obstruction of justice.

**¶ 38, 39: Specific Offense Characteristics, which result in an increase of a total 11-levels for involving the "administration of justice", do not apply.**

Mr. Watson objects to the application of the three-level enhancement under §2J1.2(b)(2)

and the 8-level enhancement under § 2J1.2(b)(1)(B) because, as Judge McFadden found, his offense did not involve the "administration of justice."

The PSR adds eleven levels to Mr. Watson's total offense level for two instances of interference with the "administration of justice" under U.S.S.G. §2J1.2(b). For the reasons set forth in Judge McFadden's opinion1 on this issue, the application of these enhancements is a legal error and factual error. The relevant specific offense characteristics provide as follows:

> If the offense involved causing or threatening to cause physical injury to a person, or property damage, *in order to obstruct the administration of justice*, increase by 8 levels.

U.S.S.G. §2J1.2(b)(1)(B) (emphasis added).

> If the offense resulted in substantial interference *with the administration of justice*, increase by 3 levels.

U.S.S.G. §2J1.2(b)(2) (emphasis added).

 The Guidelines application note states that "substantial interference with the administration of justice" includes:

> a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1 cmt. n. 1.

Courts do not interpret the Guidelines in a manner different from their interpretation of statutory text. *E.g., United States v. Martinez*, 870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation."). Thus, the proper inquiry into meaning "will most often begin and end with the text and structure of the Guidelines."

---

1 Instead of summarizing Judge McFadden's reasoning, undersigned counsel has attached Judge McFadden's Order as Exhibit 1 and incorporates it by reference.

*Id*. "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011). Therefore, courts' construction of the phrase "administration of justice" as it appears in Title 18 should not differ from their interpretation of the same phrase in the Guidelines. *Id*.

Here, there is no real debate. Every circuit that has addressed the question has held that the phrase "administration of justice" refers to judicial proceedings. *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding").

The application note to U.S.S.G. §2J1.2(b) supports that commonsense reading. Every example of substantial interference with the "administration of justice" involves interference with an investigation or evidence. U.S.S.G. §2J1 cmt. n. 1.

Text aside, law-of-the-case and estoppel principles foreclose application of these specific offense characteristics. As the Court knows, January 6 defendants have filed dozens of motions to dismiss the § 1512(c)(2) charge and in front of every judge of this Court. One of their arguments was that Congress's joint session to count electoral votes does not constitute an "official proceeding" under that statute because, among other reasons, it did not involve the administration

of justice. In response, the government contended that the joint session did not need to entail the administration of justice to constitute an "official proceeding." And in dozens of filings the government all but conceded, that, in fact, the joint session did not administer justice. See *United States v. William Pepe*, 21-cr-52, ECF No. 55 (D.D.C. 2021), p. 8 n. 3 (government: "the certification of the Electoral College vote is not an 'inquiry or investigation'"); United *States v. Knowlton*, 21-cr-46, ECF No. 63 (D.D.C. 2021), p. 12 (government: "The 'proceeding before Congress' is not limited to proceedings solely related to the administration of justice."); *United States v. Nordean*, 21-cr-175, ECF No. 106 (D.D.C. 2021), p. 21 (government acknowledging that although § 1512(c)(2) had "never been applied" outside the context of the administration of justice, the "unprecedently brazen attack" on the Capitol justified application outside that context). The government's arguments on this score led the Court to positively hold that the joint session does not administer justice. *United States v. Montgomery*, 578 F. Supp. 3d 54 (D.D.C. 2021) ("Congress does not engage in . . . 'the administration of justice.'"); see also *United States v. Sandlin,* 575 F. Supp. 3d 16, 24 (D.D.C. 2021) ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'")

The Court denied defendants' dismissal motions that argued the joint session needed to, but did not, administer justice, So, the Court cannot find, under the same tools of interpretation, that "administration of justice" now means something altogether different under the Guidelines. Under the law- of-the-case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 101 (2d Cir. 2009). The doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." *Id*.

In conclusion, Mr. Watson's conduct does not factually support the enhancements found in paragraphs 38 and 39, even setting aside the issue of whether the conduct involved "administration of justice" in general as discussed in Judge McFadden's case.   However, that case and the corresponding "administration of justice" analysis further supports Mr. Watson's argument that these enhancements are erroneously applied.

**Reasons the Support a Downward Variance and the Requested Sentence (Time-Served)**

1. **Mr. Watson's Conduct inside the Capitol.**   Mr. Watson made the poor decision to go inside the United States Capitol and disrupt the certification of the vote.   Mr. Watson naively believed that he and other protestors would engage in dialogue with lawmakers. Almost as soon as he entered the building, he realized that he made a mistake.   He also realized that many of the people who entered the building had different ideas of what they hoped would transpire after they entered.

   Mr. Watson's conduct warrants a downward variance.   Mr. Watson actively worked with police to calm and control the crowd. The Defendant's Exhibit #4 is a video of Mr. Watson using police microphone to calm down the crowds.   Defendant's Exhibit #3 is a photograph of Mr. Watson surrounded by and speaking with police.   Mr. Watson was not only helpful to police but he was instrumental is deescalating the situation.

   US Capitol Police Officer Keith Robishaw was interviewed and the following are excerpts from his interview:

   > ROBISHAW specifically remembered engaging in conversation with WATSON.
   > WATSON had been wearing a sweatshirt, mustard yellow in color, and had a
   > long beard. WATSON was quiet, reserved, appeared to be receptive to what
   > ROBISHAW was saying, and eager to help calm the crowd. ROBISHAW felt he
   > formed a "bond" with WATSON while trying to communicate with the crowd.

He further noted that Mr. Watson did not give cause for Robishaw to fear for his life.
This is true even though Officer Robishaw was aware that Mr. Watson had a cannister of
pepper spray.

Mr. Watson's was quiet and reserved when he entered the building.    He did not engage in
disruptive conduct inside.    Quite the contrary, he assisted the police in calming the crowd.
This conduct separates Mr. Watson from most other defendants and warrants a downward
variance.

2. **Mr. Watson was 23 years old when he committed the offense.**

Mr. Watson was 23 years old when he engaged in the instant offense.    Science suggests
that the human brain develops throughout early adulthood (around age 25).    This impacts
areas of executive function (e.g. decision making, planning, impulsivity.)2    Mr. Watson
likely would have made different choices regarding his offense conduct had he been older.

3. **Mr. Watson has matured since the time of the instant offense.**

This point goes hand in hand with reason #2 above.    By all accounts, Mr. Watson has
matured tremendously since the time of the offense.    Mr. Watson now believes that
Trump used him and others to perpetuate his own narrative and feels duped by the former
President.    Mr. Watson has expressed to counsel many times that he is deeply ashamed
and embarrassed of his conduct and the impact that this event has had on America.    He
also regrets bringing shame upon his parents.    Mr. Watson's several letters of support
demonstrate that he has expressed this remorse and regret to his family and friends- all of
whom note that Mr. Watson has matured and changed for the better.

---

2 Brain Maturity Extends Well Beyond Teen Years : NPR

**4. Mr. Watson's Passion for Culinary Arts.**

Mr. Watson has devoted his time to working at fine restaurants since he was released following his arrest in this case.    Mr. Watson loves cooking and desired to be a chef for a long time.    However, it is just since his arrest in this case that he decided to put childish things behind him and start focusing on his future.    Mr. Watson now has a goal to open his own restaurant after he devotes a bit more time developing his culinary skills.

Counsel has visited Mr. Watson at both Lucy's and Central restaurants.    Mr. Watson takes tremendous pride in his work.    Here he is pictured working as a poultry chef at Central Restaurant in Montgomery.[3]



---
3 Central (central129coosa.com)

5. **Mr. Watson has a child now and he continues to have family support.**

Mr. Watson now has a daughter.   He has not met her in person due to his incarceration. The birth of his daughter provides Mr. Watson new motivation to do and be a better man. Mr. Watson has wonderful role parenting role models in his own parents.   He has a large supportive family.   Mr. Watson's family provides not only emotional support, but also support mechanisms like assisting with housing and financial support.   These factors are predictive of a more positive outcome upon reentry into society.4

6. **Mr. Watson spent a year and a half on location monitoring**

After Mr. Watson was apprehended for this instant offense, he was placed in the Lee County jail because his offense conduct was a violation of his bond conditions for the pending case listed in Paragraph 55 of the PSR.   Mr. Watson spent four months in custody at the Lee County Jail.   Mr. Watson will not receive credit for that time off of his federal sentence since he was actually in custody under that case.

In addition, part of the conditions of his release for his federal case was that Mr. Watson was to obey restrictions of his location monitoring and home detention.   Mr. Watson paid significant fees to wear a location monitor.   He was restricted to home and work and could only go other places with permission from his supervising officer.   Mr. Watson experienced a prolonged period where his freedom was greatly restricted.   The Court should consider this in granting a downward variance.

---

4 Family Matters: Moving Beyond "If" Family Support Matters to "Why" Family Support Matters during Reentry from Prison - PMC (nih.gov)

## <u>Conclusion</u>

For all the reasons stated above, Mr. Watson requests a sentence of time served followed by a term of supervised release.   Mr. Watson believes this sentence is appropriate given his unique circumstances and the 3553(a) factors that he has provided the Court.

Dated this 6th day of March 2023.

Respectfully submitted,

**s/ Cecilia Vaca**
**CECILIA VACA**
Bar No.: LA27157
Bar No.: AZ025907
Federal Defenders
Middle District of Alabama
817 South Court Street
Montgomery, AL 36104
TEL:   (334) 834-2099
FAX:   (334) 834-0353
E-Mail: Cecilia_Vaca@fd.org

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR. NO. 1:21-cr-00513-RBW** |
| | ) | |
| **WILLIAM WRIGHT WATSON** | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2023, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will send notification of such filing to all counsel of

record.

Respectfully submitted,

<u>**s/ Cecilia Vaca**</u>
**CECILIA VACA**
Bar No.: LA27157
Bar No.: AZ025907
Federal Defenders
Middle District of Alabama
817 South Court Street
Montgomery, AL 36104
TEL:   (334) 834-2099
FAX:   (334) 834-0353
E-Mail: Cecilia_Vaca@fd.org

17