## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-513-RBW** |
| **WILLIAM WATSON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence William Watson to 46 months of incarceration, in the middle of the advisory guidelines range, 36 months of supervised release, $12,000 in restitution, and a mandatory special assessment of $200.

### I.     INTRODUCTION

William Watson participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Watson traveled to Washington, D.C. in violation of a court order that he not leave his home state while on bond for drug trafficking charges. Watson brought two dangerous weapons with him to Washington—a stun gun and a knife—and brought the knife with him into the Capitol.

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Watson was an enthusiastic participant in the frenetic attack by rioters on the West Plaza. He helped overrun Capitol Police officers defending the Northwest Stairs under the inauguration scaffolding, and he cut through that scaffolding with his knife so that the rioters could more easily reach the Capitol building. In addition, Watson obtained a third dangerous weapon, a cannister of Sabre Red OC spray, which he used to threaten officers during his attack on the Capitol. Watson's aggression enabled him to be one of the first rioters to reach and then breach the Capitol building. He helped destroy a window at the Senate Wing Door entrance and climbed through it as part of the rioters' first breach of the Capitol, forcing the building into lockdown.

The government recommends that the Court sentence Watson to 46 months' incarceration, which is in the middle of the advisory Guidelines' range of 41 to 51 months, which the government submits is the correct Guidelines calculation. A 46-month sentence reflects the gravity of Watson's conduct, his disrespect for the law, and the need to deter Watson and others from similar conduct.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 46, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power following the November 3, 2020 presidential election.

### B.    Watson's Role in the January 6, 2021 Attack on the Capitol

William Watson, a 25-year-old resident of Auburn, Alabama, was among the first rioters to breach the Capitol during the January 6, 2021 attack, which took place as Congress met to certify the results of the 2020 Electoral College vote. His crimes are documented through a series of

videos provided to the FBI by concerned citizens, open-source video, and surveillance footage from inside of the Capitol.

### Conduct and Statements before Jan. 6, 2021

On December 31, 2020, while on bond pending trial for state drug trafficking charges, Watson livestreamed himself playing a videogame and used the opportunity to express his willingness to engage in violence to stop President-elect Biden from taking office:

> You know who's not going to prison regardless of his fucking sentence? This guy. No. Sorry. If you give me a 15-year sentence, I'm going to DC and killing Joe Biden. I'm just going to dedicate my life to that. You can take me out that way. I'd rather just die in a blaze of glory than do 15 years in fucking prison. Might do something meaningful. Getting rid of China Joe, that'd be nice.[2]

### Approach to the Capitol

On January 5, 2021, Watson traveled with a friend by car from Auburn, Alabama to Washington, D.C., "because they were certifying the fraudulent election that day," as he would later admit to law enforcement. He brought with him a stun gun and a knife with a three to four–inch blade, and he carried the knife with him to the Capitol the following day.

---

[2] Ex. 1 at 3–5. Twitch, a livestreaming platform, provided law enforcement with the quoted statement attributed to an account operated by Watson. Twitch also provided a screenshot of Watson's livestream taken at the time of the statement. FBI investigators recognized Watson as the person livestreaming.



*Watson on Capitol grounds near the Peace Circle on Jan. 6, 2021[3]*

On January 6, 2021, Watson attended President Trump's speech at the Ellipse near the White House, then joined the crowd of attendees as they walked west toward the Capitol. Between 1 and 2 p.m., Watson entered onto the northwest area of U.S. Capitol grounds after walking through the area commonly known as the Peace Circle, where bicycle rack barricades had been defended by U.S. Capitol Police ("USCP") officers until they were overrun at about 12:50 p.m. Watson advanced to the front of the crowd on the West Plaza near the staging area that had been set up for the January 20, 2021 presidential inauguration. Law enforcement had blocked the crowd from advancing past the West Plaza by establishing a barrier of metal bike racks.

By 1:48 p.m., Watson and other rioters had gathered at the north end of the West Plaza at the entrance to covered scaffolding erected over the Northwest Stairs. Up until that point, a small line of USCP officers had defended this entrance with a bike-rack barricade. Watson and others in the crowd surged against the line of officers and forced their way into the scaffolding. Watson can be seen in the crowd pushing with other rioters.

---

[3] Ex. 9 at 17 seconds (third-party video).



*Watson and other rioters push into scaffolding covering the Northwest Stairs at 1:48 p.m.[4]*

Once under the scaffolding, Watson hoisted himself onto the metal scaffolding itself, such that he could then bypass the crowd and again reach the front line, where rioters clashed with police officers at the far end of the scaffolding.



*Watson climbing inauguration scaffolding on Northwest Stairs[5]*

---

[4] Ex. 3 (third-party video) at 22:22.
[5] Ex. 4 (third-party video) at 6:47.

5

Watson then pulled the hood of his sweatshirt over his head and climbed down from the scaffolding to join the front of the crowd, which can be heard chanting "Cut the screen!" at this time. Watson later admitted to using his knife while inside the scaffolding to cut through its cloth covering so that he and other rioters could move through it.



*Watson inside scaffolding on the Northwest Stairs[6]*

CCV shows multiple rioters cutting through this portion of the scaffolding covering at approximately 2:05 p.m.:

---

[6] Ex. 5 (third-party video) at 0:40.



*Scaffolding covering the Northwest Stairs. Cuts in the scaffolding covering near where Watson stood are circled in red.[7]*

      As shown in the picture above, officers had fallen back to establish another defensive line halfway up the Northwest Stairs. However, at 2:09 p.m., Watson and the other rioters overran this line as well and ascended the remainder of the staircase.

---

[7] Ex. 6 (CCV) at 5:00 (approx. 2:05 p.m.).



*Watson ascends Northwest Stairs toward Capitol building at 2:10 p.m.[8]*

While on Capitol grounds, Watson obtained a can of Sabre Red oleoresin capsicum ("OC") spray. At approximately 2:11 p.m., Watson examined the cannister as he and the rioters reached the top of the Northwest Stairs.



*Watson examining cannister of OC spray[9]*

---

[8] Ex. 7 (CCV) at 2:10 p.m.
[9] Ex. 3 (third-party video) at 39:37.

8

Shortly after 2:10 p.m., Watson and other rioters breached a final line of USCP officers at the top of the Northwest Stairs and entered onto the Upper West Terrace of the Capitol. As officers were forced to retreat out of the path of rioters, Watson approached them with the OC spray cannister outstretched in his hand as if about to deploy it against them.



*Watson pointing OC spray cannister at officers on Upper West Terrace*[10]

### Breach of Capitol Building

Watson soon reached the Senate Wing Door of the Capitol building where rioters began banging on the windows. Rioters smashed the glass, setting off a blaring overhead alarm, and eventually scraped out a large enough opening in the windowpane for two individuals to crawl through. Watson followed, however, rather than crawl through the opening, he stood up on the window's ledge and smashed out the remaining glass in the window, making it significantly easier for him and the other rioters to climb through. This entry point at the Senate Wing Door at 2:13 p.m. was the first breach of the Capitol building on January 6, and the Joint Session of Congress

---

[10] Ex. 3 at 40:23; *see also* Ex. 8 at 10:57 (third-party video).

was adjourned minutes later as the building went into lockdown. Watson was among the first 40

rioters to breach the Capitol building that day.[11]





*Watson smashes remaining glass from Senate Wing Door window and enters through it[12]*

After his 2:13 p.m. entry, Watson turned north toward the Senate side of the building and

then turned east toward the Senate Grand Stairs, which provide access to the Senate Chamber and

---

[11]  The Architect of the Capitol estimated that the cost of repairing each window in the Senate Wing Door area was in excess of $10,000. Ex. 2 at 2 (Feb. 22, 2021 Architect of the Capitol Estimation).

[12]  Ex. 10 (CCV) at 2:13 p.m.

the Rotunda areas of the Capitol. At the base of these stairs, Watson joined the rioters pursuing USCP Officer Eugene Goodman up to the second floor of the Capitol—several armed with shields, batons, and spears. Officer Goodman diverted Watson and the other rioters away from an unobstructed entrance to the Senate Chamber and toward the Ohio Clock Corridor, another entry point to the Senate Chamber that was being guarded by other USCP officers. Watson and the other rioters entered the Ohio Clock Corridor between 2:14 and 2:15 p.m.



*Watson in the Ohio Clock Corridor near the Senate Chamber*[13]

While Watson and the crowd pursued Officer Goodman to the Ohio Clock Corridor, the Senate was adjourning their proceedings and the Senate Chamber went into lockdown. Watson came within feet of the entrance to the Senate Chamber, which had yet to be evacuated. Vice President Mike Pence, who had presided over the Senate Chamber that day, did not evacuate until 2:26 p.m., ten minutes after Watson and others entered the hallway.

---

[13] Ex. 11 (third-party image).

After entering the Ohio Clock Corridor, Watson and other rioters confronted the line of officers blocking their path toward the Senate Chamber. One officer on this line, USCP Officer Keith Robishaw, recalled encountering Watson among the crowd that day. Officer Robishaw stated that when he asked if anyone in the crowd had weapons, Watson pulled out his can of pepper spray and showed it. Officer Robishaw asked Watson to give him the pepper spray, but Watson put it back in his sweatshirt pocket.



*Watson and other rioters confront police in Ohio Clock Corridor.[14] (Watson circled in red; USCP Officer Keith Robishaw circled in green; Senate Chamber entrance circled in blue).*

At 2:17 p.m., after speaking with officers and other rioters, Watson addressed the crowd using another rioter's microphone. He said that police were "willing to work with us" and "cooperate peacefully." However, Watson said that the rioters needed to "gather more Americans" into the room so that they and police could "discuss what needs to be done." Ex. 13 at 20 seconds.

---

[14] Ex. 12 (CCV) at 2:18 p.m.

At 2:17 p.m., after speaking with officers and other rioters, Watson addressed the crowd using another rioter's microphone. He said that police were "willing to work with us" and "cooperate peacefully." However, Watson said that the rioters needed to "gather more Americans" into the room so that they and police could "discuss what needs to be done." Ex. 15 at 20 seconds.

Over the next 30 minutes, other rioters began filtered out of the Ohio Clock Corridor, but Watson remained. *See* Ex. 12 (CVV) at 2:42 p.m. He continued to speak with other rioters in the corridor, watched a rioter deploy a fire extinguisher toward officers, and ultimately pushed past officers at 2:48 p.m. to reach the remainder of the corridor. Ex. 12 at 2:22 p.m.; 2:48 p.m.

With the crowd's path into other parts of the Capitol blocked by law enforcement, see Ex. 14 (CCV) at 4:11 (approx. 2:44 p.m.), Watson returned to the Ohio Clock Corridor, made a phone call to an unknown person, and was then waved out by MPD officers at approximately 2:51 p.m. Ex. 12. Watson and other rioters were escorted out of the Senate Carriage Door at 2:55 p.m., nearly 45 minutes after Watson first breached the building. Ex. 15 (CCV).



*Watson walking away from an MPD officer waving him toward the exit.*[15]

---

[15] Exhibit 12 (CCV) at 2:50 p.m.

### *Post-Jan. 6 Conduct*

In the days following the Capitol riot, Watson posted a photograph of himself inside the Capitol to Snapchat with the caption, "They wanna call me Antifa because I have a video game tattoo on my hand and I was pleading for peaceful discourse. Let em say what they will. The fake news won't win against the thousands of patriots recorded today." *Id.*

On January 11, 2021, Watson was interviewed by FBI personnel after waiving his *Miranda* rights. Watson admitted entering the Capitol on January 6 and to using a pocketknife with a three to four–inch blade to cut through inauguration scaffolding. He also admitted to entering into the Capitol through a broken window, but denied being responsible for breaking it.

Despite witnessing several violent altercations with police on the West Plaza and Northwest Stairs, Watson stated that he was not aware of any individuals who were causing violence. Instead, Watson falsely blamed the police for the violence that occurred on January 6, attributing it to law enforcement's "aggressive use of tear gas and pepper balls and mace." Watson also stated that he believed law enforcement was there, "to protect all of us, but not if they're committing treason."

On January 15, 2021, Watson was interviewed again by FBI personnel. When confronted with video showing him holding a cannister of OC spray and pointing it toward officers, *see* Ex. 5, Watson admitted to obtaining the cannister on Capitol grounds, though he gave conflicting accounts as to whether he found the cannister on the ground or whether someone handed it to him. He also attempted to minimize this conduct while still describing his intent as a threat of force. He stated that his intent in pointing the OC spray at the officers was "more of, like a, don't fucking do anything to me type thing. Not necessarily a threat, but like, a threat of definitely going to defend

myself if one of y'all decides to shoot some mace at me or something." Watson stated that it was directed "to the officers, I reckon." Watson also implausibly claimed that he never knew how to use the OC spray, despite its being operated by the press of a button. When Watson was asked why he did not admit possessing the OC spray during the prior interview, he said he was afraid he would be punished more severely if it was known he carried the OC spray.

## III.   THE CHARGES AND PLEA AGREEMENT

On August 6, 2021, a federal grand jury returned an indictment charging Watson with eight counts, including Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A). On November 18, 2022, Watson was convicted of those two offenses as the result of a stipulated trial.

## IV.   STATUTORY PENALTIES

Watson now faces sentencing on 18 U.S.C. § 1512(c)(2) (Count One) and 18 U.S.C. § 1752 (a)(1) and (b)(1)(A) (Count Three). As noted by the Presentence Report issued by the U.S. Probation Office, on Count One, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100. On Count Three, Watson faces up to 10 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Probation Office has calculated the applicable Guidelines Offense Level in its Final Pre-Sentence Investigation ("PSR") to be 25, to which the government has made no objection. ECF No. 53. The government submits the correct Guidelines analysis is as follows:

Count One: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. §2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. §2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. §2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| | | **25** |

Count Three: 18 U.S.C. § 1752(a)(1) and (b)(1)(A)[16]

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| U.S.S.G. §2B2.3(b)(2) | Dangerous Weapon Possessed | +3 |
| U.S.S.G. §2X1.1(a) | Base Offense Level (adjusted) | 25 |
| | | **9** |

The government agrees with the Probation Office that Count One and Count Three, which charged 18 U.S.C. § 1752(a)(2) and (b)(1)(A), group for the purposes of the Guidelines analysis.

---

[16] The final PSR does not include a Guidelines analysis for both Counts—Counts One and Three—to which the defendant pleaded guilty. *See* PSR ¶¶ 35-51. Sections 1B1.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The final PSR concludes (*see* PSR ¶ 39) that Counts One and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

Further, the government agrees that Count One is the substantive offense to be applied pursuant to the cross-reference to USSG §2X1.1 directed by USSG §2B2.3(c)(1). The Probation Office agrees. *See* ECF No. 53 at 11.

|  | | **Total** | **25** |
|---|---|---|---|
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | | <u>-3</u> |
| **Total Adjusted Offense Level:** | | | **22** |

The U.S. Probation Office calculated Watson's criminal history as category I, which is not disputed. PSR ¶ 42. The resulting advisory Sentencing Guidelines range is 41 to 51 months incarceration.

Watson objects to the Probation Office's guidelines calculation on the grounds that neither U.S.S.G. §2J1.2(b)(1)(B) or §2J1.2(b)(2) apply. First, regarding the eight-level enhancement of §2J1.2(b)(1)(B), Watson argues that it did not apply because he did not commit property damage "in order to obstruct the administration of justice" or "as a means of intimidation or retaliation against anyone." But this enhancement applies for at least three independently sufficient reasons. First, Watson plainly damaged property in furtherance of his breaching the U.S. Capitol building and obstructing the Electoral College certification; cutting the cloth covering the inauguration scaffolding got him closer to the Capitol building, and breaking the window in the Senate Wing was his way into the building.

Second, the 8-level enhancement is independently warranted by Watson's "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice." When Watson reached the Upper West Terrace and headed for the Senate side of the Capitol Building, he pointed an OC spray cannister, a dangerous weapon, in the direction of police officers as a

means of communicating, in his own words, "don't fucking do anything to me" and that he was ready to defend himself. In his PSR objections, Watson does not refute this conduct or its ability to trigger Section 2J1.2(b)(1)(B).

Third, Watson's criminal conduct occurred in the context of participating in a riotous mob seeking to halt Congress, including by way of intimidation. His actions facilitated the access of still other rioters to the Capitol and the officers trying to protect it; he aided and abetted those other rioters in both creating a substantial threat of violence against those officers and obstructing the administration of justice themselves.

Next, with respect to the three-level enhancement of §2J1.2(b)(2), Watson claims that his conduct was not substantially obstructive. However, U.S.S.G. §2J1.2(b)(2) applies wherever "the offense *resulted in* substantial interference with the administration of justice" (emphasis added). The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Watson's criminal actions clearly resulted in the unnecessary expenditure of substantial governmental resources. The riot in which Watson participated resulted in evacuations, vote count delays, officer injuries, and more than $2.7 million in losses. This Court previously applied both §2J1.2(b)(2) and 2J1.2(b)(1)(B) under similar factual circumstances in *U.S. v. Dustin Thompson*, Case No. 1:21-cr-161, in line with several other Courts in this District in Capitol riot matters. *E.g. United States v. Hodgkins*, Case No. 21-cr-188-RDM; *United States v. Fairlamb*, Case No. 21-cr-120-RCL; *United States v. Chansley*, Case No. 21-cr-3-RCL; and *United States v. Wilson*, Case No. 21-cr-345-RCL.

Finally, Watson argued that neither enhancement applied because Watson's interference with Congress's Certification of the Electoral College did not concern the "administration of justice." This argument similarly fails. First, §2J1.2 applies to an array of obstruction statutes that demonstrate its applicability outside strictly judicial or quasi-judicial proceedings. See U.S.S.G. §2J1.2 cmt. (listing covered statutes). Second, §2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of violent and dangerous conduct at issue in this case. U.S.S.G. §2J1.2 cmt. Background. Third, §2J1.2's commentary provides a broad definition of "administration of justice," which, as already noted, includes, "the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. §2J1.2 cmt. n.1. All but one court in this district has found Section 2J1.2 applicable to the mob's interference with the Electoral College certification, a constitutionally mandated function.[17]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Watson's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from

---

[17] *See, e.g.*, *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 21-cr-193 (BAH) (contested); *United States v. Pruitt,* No. 21-cr-23 (Kelly, J.); *United States v. Rahm*, 21-cr-150 (Hogan, J.) (contested); *United States v. Andries*, 21-cr-93 (Contreras, J.). Watson relies on Judge McFadden's contrary holding in *United States v. Seefried*, 21-cr-287 (TNM), 2022 WL 16528415 (Oct. 29, 2022), but that is decidedly the minority view among the judges of this District.

being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The government does not dispute that evidence shows that Watson at times appeared to attempt to calm other rioters while the crowd confronted officers in the Ohio Clock Corridor, but the nature and circumstances of Watson's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 46 months' incarceration and 36 months' supervised release.

### B.  The History and Characteristics of the Defendant

Watson is a 25-year-old resident of Auburn Alabama. On July 2, 2020, Auburn law enforcement officers executed a search warrant on Watson's residence, where they found LSD, THC edibles, suspected MDMA, assorted drug paraphernalia, assorted paperwork, a flamethrower/blowtorch, and $15,022 in cash. The police also seized a number of firearms: Windham Weaponry WW-15,.556 caliber; Angstadt Arms AA-1045 .45 caliber; Sig Sauer MPX 9mm; Daniel Defense DD5 V2 7.62 caliber; Delt-Ton Inc DTI-15, 5.56 caliber; Keltec Industries KSG 12 gauge; Ruger SR1911 9mm; Glock 45GEN 9mm; Mossberg 590 12 gauge; North American Arms Unknown Model .22 caliber; and Sig Sauer P365 9mm.

On August 12, 2020, a grand jury indicted Watson on two counts of drug trafficking and two counts of possession of a controlled substance in relation to the July 2 search. Watson pled not guilty to all charges. According to the PSR, Watson is scheduled for a plea hearing on March 14, 2023 and for trial on March 27, 2023. Although Watson pled not guilty these charges and accordingly deserves a presumption of innocence, these charges provide important context for Watson's choice to travel to Washington, D.C. to participate in the events of January 6.

On Jan. 5, 2021, when Watson traveled to Washington, D.C, Watson was on pretrial release

for the Alabama drug trafficking charged, and the conditions of his pretrial release forbade him from leaving the state. On January 11, 2021, following Watson's return to Alabama, a writ of arrest was issued in relation to the violation of his bond conditions committed by traveling out of state without authorization on Jan. 5, 2021. Watson's bond was revoked and he was committed to pretrial detention. On April 28, 2021, Watson's bond on these charges was reinstated with added conditions that he wear an ankle monitor and undergo biweekly drug tests.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Watson's criminal conduct—threatening officers with OC spray, damaging Capitol property to breach the Capitol building, climbing in through a broken window, carrying multiple dangerous weapons—was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[18] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

There is also a need for specific deterrence here. Watson traveled to Washington, D.C. with

---

[18] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

a knife and a stun gun and he carried his knife and a can of OC spray into the Capitol building. Watson threatened law enforcement with that OC spray, and he damaged property on Capitol grounds multiple times.

Further, Watson's travel to D.C. that day was a violation of his bond conditions, and the statements he made online shortly before the trip speak clearly to his lack of respect for the justice system: "You know who's not going to prison regardless of his fucking sentence? This guy." Ex. 1 at 5. Facing potential imprisonment, Watson vowed to assassinate the President-elect of the United States rather than adhere to the Court's judgment. *Id.*

Watson's conduct at the U.S. Capitol that day further evinced his grave disrespect for our democracy and the rule of law; the Court's sentence should send a clear message to Watson that such disrespect for the law carries severe consequences.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[19]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[20]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[19] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[20] A routinely updated table providing additional information on the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in *U.S. v. Jacob Chansley*, Case No. 1:21-cr-3 (RCL), *United States v. Pruitt,* Case No. 1:21-cr-23, and *United States v. Anthony Williams*, Case No. 1:21-cr-377 (BAH) provide suitable comparisons to the relevant sentencing considerations in this case.

Chansley and Watson were two of the first individuals to breach the Capitol building on Jan. 6, 2021, with both men participating in the crowd's violent surge up through the inauguration scaffolding covering the Northwest Stairs. Further, after entry, Chansley and Watson both followed the same path after entering, as both joined in the crowd pursuing Officer Goodman up to the Ohio Clock Corridor. Like Watson, Chansley carried a dangerous weapon into the building, though neither used it while inside. Because Chansley, like Watson, qualified for acceptance of responsibility, his sentencing guidelines offense level was 22, with a corresponding range of 41-51 months imprisonment. Both defendants qualified for the eight-level enhancement under U.S.S.G. §2J1.2(b)(1)(B). Judge Lamberth imposed a sentence of 41 months' imprisonment, within the Guidelines range. Chansley had more colorful conduct—his attire and his shouting received significant news coverage—but Watson's conduct was more serious in several respects. Chansley gave a fulsome briefing to law enforcement, while Watson made material omissions in his first interview and continued to minimize his conduct in his second interview. Further, while Chansley and Watson both threatened to cause physical injury, Watson went further in committing multiple acts of property damage.

In *Williams*, the defendant helped rioters climb bicycle racks that were repurposed by the rioters as ladders to climb the foundational walls of the Capitol building to flank and overrun the police on the Northwest Stairs. Williams recorded himself on those stairs and bragged, "[w]e just stormed the stairs of the Capitol, pushed the cops back and were maced and pepper-sprayed, and

hit everybody. Fuck that, we took this fucking building." He then stole water bottles that USCP officers had stored on the Upper West Terrace of the Capitol building to be used for decontamination if USCP officers were hit with chemical irritants. Williams, like Watson, was one of the first rioters to enter the Capitol and did so via the Senate Wing Door only six minutes after the doors were initially breached, shortly after Watson entered. Williams followed his rioting at the Capitol by bragging on social media about his actions, expressing no remorse, just as Watson posted on social media expressing more concern that he be mistaken for Antifa than for his participation in the attack on the Capitol. Williams and Watson are also similar in joining assaultive crowd movements—Watson on the Northwest Stairs and Williams in the Crypt—without committing one-on-one assaults on officers.

Following Williams's conviction at trial, the Government and Probation both calculated the defendant's total offense level as 25 and criminal history category as I,[21] resulting in a Guidelines range of 57 to 71 months' imprisonment. The Court imposed a 60-month sentence..

Pruitt threw a chair and a sign; Watson cut through inauguration scaffolding and smashed out a window. Pruitt directly confronted officers that day, but did not, to the government's knowledge, commit an assault. Pruitt had a more significant criminal history than Watson, but like Watson, he participated in the riot while on pretrial release, making his conduct all the more culpable. Watson threatened officers and joined in the crowd's pushing past police lines but also did not, to the government's knowledge, individually assault an officer that day. Judge Kelly also

---

[21] Williams had considerable criminal history, with 8 adult criminal convictions and 3 juvenile adjudications. Nevertheless, because of the advanced age and/or minor nature of his convictions, his criminal history category was I.

applied the eight-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B) and the three-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(2) based on this conduct, and sentenced Pruitt to 55 months' incarceration.

Additionally, Watson's conduct is also comparable, but in several respects more onerous, than that of Dustin Thompson, Case No. 1:21-cr-161, who this Court sentenced to 36 months of incarceration followed by 36 months of supervised release . Both men reached sensitive areas of the Capitol building after seeing clear indications that they were not allowed there. While Thompson faced a higher sentencing range because he testified falsely at trial, Watson's conduct was in many respects more serious than Thompson's. Unlike Thompson, Watson brought two dangerous weapons into the building. Unlike Thompson, Watson threatened officers by pointed a weapon at them. Unlike Thompson, Watson engaged in property destruction twice – once with his knife and later by knocking the glass out of a broken window at the Senate Wing Door. And unlike Thompson, who entered the building after the initial breach, Watson was part of the initial breach itself.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims

27

of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[22]  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[23]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d

---

[22]  While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[23]  The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[24] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader

---

[24] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Watson's conduct in entering the Capitol building as part of a mob—particularly in damaging the inauguration scaffolding's covering and a Capitol building window—caused damage to that building.

casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[25]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each

---

[25] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Watson to pay $12,000 in restitution for his convictions on Counts One and Three. Courts have typically set restitution at $2,000 for rioters based on the damage to the Capitol caused collectively by rioters, and Watson in particular went further in cutting into inauguration scaffolding and smashing a window at the Senate Wing Door entrance. The Architect of the Capitol estimated that each window at this entrance cost more than $10,000 to repair. Ex. 7 at 2. A total restitution amount of $12,000 fairly reflects Watson's role in the offense and the damages resulting from his conduct.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 46 months of incarceration, 36 months of supervised release, $12,000 restitution, and a mandatory assessment of $200 for his two felony convictions.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:      _/s/ Hutton Marshall_____
         J. HUTTON MARSHALL
         Assistant U.S. Attorney
         DC Bar No. 1721890
         601 D Street, N.W.
         Washington, D.C. 20579
         (202) 809-2166
         Joseph.hutton.marshall@usdoj.gov