```
 1                 BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 21-cr-513
 4            Plaintiff,              .
                                      .
 5         vs.                        .
                                      .  Washington, D.C.
 6   WILLIAM WATSON,                  .  March 9, 2023
                                      .  9:16 a.m.
 7            Defendant.              .
     - - - - - - - - - - - - - - - -

 8

 9                  TRANSCRIPT OF SENTENCING HEARING
                  BEFORE THE HONORABLE REGGIE B. WALTON
10                   UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:      ALEXANDER DIAMOND, AUSA
                                 KIMBERLY PASCHALL, AUSA
14                               United States Attorney's Office
                                 601 D Street Northwest
15                               Washington, D.C. 20579

16

17   For the Defendant:         CECILIA VACA, AFPD
                                 Federal Public Defender's Office
18                               817 South Court Street
                                 Montgomery, Alabama 36104

19

20

21   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S
 2            (Call to order of the court.)
 3              COURTROOM DEPUTY:  This is 21-513, United States of
 4      America versus William Watson.
 5          May I have counsel and Probation approach the lectern and
 6      state your appearance for the record, beginning with the
 7      government.
 8              MR. DIAMOND:  Good morning, Your Honor.  Alexander
 9      Diamond for the United States, here with AUSA Kim Paschall.
10              THE COURT:  Good morning.
11              MS. VACA:  Good morning, Your Honor.  Cecilia Vaca
12      appearing on behalf of William Watson.
13              THE COURT:  Good morning.
14              PROBATION OFFICER:  Good morning, Your Honor.  Hana
15      Field with U.S. Probation.
16              THE COURT:  Good morning.
17          Okay.  In preparation for the sentencing today, I did
18      review again the Statement of Facts for the Stipulated Trial,
19      also the presentence investigation report, also the Probation
20      Department's sentencing recommendation, also the government's
21      sentencing memorandum, also the defendant's sentencing
22      memorandum, along with, it looked like to me, there were --
23      well, it's six exhibits, but it was a total of, it seems like,
24      15 different items that were submitted, along with letters,
25      photographs, ACT scores, also the defendant's motion for a
```

1    downward variance, and also the notice of filing of Exhibit 4.

2          Is there anything else I should have reviewed in

3    preparation for the sentencing?  Government counsel?

4                MR. DIAMOND:  No, Your Honor.

5                THE COURT:  Defense counsel?

6                MS. VACA:  No, Your Honor.

7                THE COURT:  There was a -- several challenges to the

8    presentence investigation report by defense counsel, and I will

9    hear from counsel regarding those objections, first regarding

10   sentencing guideline 2J1.2(b)(1)(B).

11               MS. VACA:  Yes, Your Honor.

12               THE COURT:  Are you fully vaccinated?

13               MS. VACA:  Yes, Your Honor, I am.

14               THE COURT:  You can take your mask off.  It's easier

15   for everybody to hear.

16               MS. VACA:  Thank you.

17         Your Honor, first -- my first objection was to the

18   eight-level increase under 2J1.2(b)(1)(B).  And Your Honor, I

19   have outlined my reasons for that in my sentencing memorandum,

20   but I should begin that there are a few actions by Mr. Watson

21   that I think Probation and the government argue should trigger

22   this enhancement for Mr. Watson.

23         There is property damage.  The property damage consists

24   of -- and I think the Court probably saw the video from the

25   government.  But Mr. Watson entered a window that had already

1    been broken, but it was still kind of like -- part of the pane

2    was still there, and when he came through, he broke that out.

3    So there was that damage to a single pane window.

4         And then there was also scaffolding outside of the Capitol

5    building that Mr. Watson admitted to cutting with a knife to

6    allow protestors to move further towards the Capitol building.

7         That would be the property damage aspects of it.

8         As to the property damage, Your Honor, I think this

9    guideline is clear that the property damage as done by the

10    defendant must be done as a means of intimidation or

11    retaliation.  When we look at this guideline in general, I think

12    we're looking where it's probably utilized more in the aspect

13    of, let's say, witness intimidation or maybe investigator, FBI

14    or something of that nature, investigating and a defendant who

15    is trying to obstruct that investigation or obstruct a witness

16    from testifying.

17         In this specific case -- and the property damage, let's

18    say, for example, that a defendant maybe goes to a witness's

19    house and burns down that house or burns down a shed outside of

20    their home as a clear signal to them hey, you don't need to

21    testify against me or there's going to be issues here.

22         In this case, Your Honor, the property damage, while

23    Mr. Watson regrets his conduct and he regrets any property

24    damage that he may have done, that property damage was not

25    carried out for the purpose of retaliating or intimidating the

people who were certifying the election, if that's who, I guess, we're talking about here, or really anybody else.  Was it a good idea?  No.  Was it good to cut down the scaffolding so that they could move forward?  No.  In retrospect, all those things are not.

But this part, this guideline specifically should be used in a context where the property damage is done for intimidation or retaliation.

There's also the aspect that the guideline -- or that Mr. Watson was outside the Capitol building, and there is -- in his witness statement and in the stipulated facts, he agrees that he brought a OC spray can into the Capitol building, but apparently, somewhere outside, he either picked this OC spray up outside or someone gave it to him, whatever.  I think the PSR and the -- I guess the investigative notes would differ, but he got it somewhere outside.

And at some point in a video that Your Honor is going to see, I think the government is going to play videos, Mr. Watson holds up this spray.  And he tells -- and you can see in the video or even in the picture that's in the government's presentence -- I mean sentencing memorandum, the -- there are police officers standing in a distance from that.  And he said, you know -- they asked him if he held it up or why he was holding it up, and he said, you know, he was letting them know, hey, I've got this, don't attack me basically.  He wasn't using

1    it to threaten them.

2         But I think really, Your Honor, when we look at this, I was

3    here, Your Honor, the last -- when you sentenced Dustin

4    Thompson, and I stayed here to watch that sentencing.  And I

5    know that at that time when Mr. Thompson was arguing against the

6    eight-level enhancement, I think the Court had some, I guess it

7    seemed to me, reservations about whether he should get the full

8    eight levels or get the eight levels.

9         Mr. Thompson's case is a little bit different in the sense

10   that Mr. Thompson went into, I think it was, the Senate

11   Parliamentarian's office, and there was some melee in there and

12   some property damage that occurred.  Even though he didn't, I

13   guess, do the damage himself or damage any of the materials

14   himself, he apparently was yelling around about getting a

15   computer and other things like that, and I think the Court

16   ultimately imposed that eight-level enhancement.

17        And I still honestly, I look at the applications of these

18   guidelines, Your Honor, and obviously, you know I'm coming here

19   from the Middle District of Alabama, and this is my only

20   January 6 case.  But I have been following the cases just to be

21   abreast of what's going on.  Obviously, I can't know as much as

22   the government knows about all the other cases.

23        But I would say that though the eight-level enhancement has

24   been applied by several judges of this district, one thing I

25   could note, Your Honor, is that I know that many of these

1   defendants took plea agreements, and I know their plea

2   agreements specifically had this offense characteristic and this

3   enhancement in their plea agreement, and they were agreeing to

4   that.

5        One of the big reasons why we did the stipulated trial was

6   the ability to argue against the application of this guideline

7   for the reasons that I've stated, Your Honor.  I think

8   particularly, you know, when you look at the guidelines in

9   general and you look at the -- I guess the base offense level

10  and any enhancements that may apply, they are to capture the

11  seriousness of the offense and specifically the defendant's

12  conduct in an offense.

13       And when you look at different sentencing guidelines, Your

14  Honor, whether -- let's say that a client is charged with

15  carjacking.  He gets a seven-level enhancement for the discharge

16  of a firearm during that offense.  Or under 2K2.1, the gun

17  guideline, if a defendant uses a gun in furtherance of another

18  offense, even if it's violent, shooting at an unoccupied

19  vehicle, that's a four-level enhancement.

20       And I think that that's why the language in this guideline

21  that says that this guideline and this enhancement should be

22  used in the most serious of cases, it's for that reason that I

23  would argue, Your Honor, that this guideline and this

24  application of this guideline does not apply to Mr. Watson.

25       Specifically, I think, Your Honor, when I'm looking at how

1   the Court might consider Mr. Watson and the application of this

2   guideline, I think that when you look at Mr. Watson and

3   according to 1B1.3 regarding the conduct that the Court should

4   consider, I mean, we go back to that guideline that just tells

5   us like what conduct from the defendant should we consider.  And

6   it's things that he actually does, things -- you can consider

7   the conduct of others, if it was something that they, you know,

8   agreed to do, something -- it says, "The Court must first

9   determine the scope of the criminal activity that this

10   particular defendant agreed to jointly undertake."

11        I think one thing that we can agree on is that the

12   happenings, what happened -- I don't know.  Maybe some people

13   thought they might break into the Capitol.  But I think for the

14   vast majority of those individuals, they got caught up in

15   whatever thoughts they had going on, whatever fervent ideas they

16   had going on about this election, and things got out of control.

17   People started going in the Capitol.  And my client, along with

18   a lot of other people, made a very poor decision -- poor is

19   maybe an understatement -- to go inside the Capitol building.

20        But as far as like jointly undertaking activity or some

21   kind of meeting of the minds of these people before they went in

22   the Capitol building, it seems very overstated.

23        I would argue, Your Honor, if you look at Mr. Watson's

24   conduct, I would argue that this sentencing enhancement doesn't

25   apply.

1     And if Your Honor doesn't agree with my analysis regarding

2     that, I would still ask the Court to consider, you know, the

3     application of, instead of eight levels, maybe two levels or

4     three levels instead, because of the maybe disagreement with the

5     application of a full eight-level enhancement for the conduct

6     that I have stated here, which would have been the breaking of

7     the single pane glass that was already broken, finishing

8     breaking that, the scaffolding, and the OC spray.

9         I would note also, Your Honor, that the OC spray situation

10    and the scaffolding occurred outside the Capitol building before

11    the entry into the Capitol building, which in essence became the

12    obstructive conduct.  I mean, that is what halted the counting

13    of the electoral vote.  That's basically what took this -- what

14    was the beginning of this offense.  I don't think that these --

15    any of these things were made in planning or preparation for

16    ultimately getting into Capitol building.  That gives way too

17    much credit to what happened next.

18        So that's my argument regarding that enhancement, Your

19    Honor.  Would you like me to move on to the next one, or do you

20    have questions?

21        THE COURT:  Let me hear from government counsel.

22        MS. VACA:  Okay.  Thank you.

23        MR. DIAMOND:  Your Honor, the defense here touches on,

24    I think, a couple of different points, and I will just address

25    the first one briefly, which is whether or not this guideline

enhancement should be limited to judicial-related proceedings. The defense references a number of examples.

THE COURT:  I don't know if I would restrict it to that degree, but it seems to me that it arguably was designed to deal with matters related to some attempt to subvert the criminal justice system.  For example, I don't -- it's not the case, maybe not in the system yet, but if somebody has, you know, committed a crime and they try and stop somebody from reporting it to the police, even though it hasn't gotten to the judicial stage yet, I would think that this enhancement would apply.

But when you look at the entire wording of the provision, along with the commentary, it seems to be dealing with obstructing some type of action that would subvert the judicial process.

MR. DIAMOND:  Well, Your Honor, while we agree with the point that the guideline commentary and background does seem to have to do with the administration of justice, that has a broad definition that's provided by the backgrounds of the guidelines, and although some illustrative examples refer to judicial process specifically, the guidelines reference a number of statutory provisions that go beyond simply judicial proceedings and quasi judicial proceedings.

And Your Honor and the other justices of this court, with the exception of Judge McFadden, have found that the -- this

section of the guidelines applies beyond purely judicial

proceedings.  And we don't think that that legal judgment should

be changed.

    There's no specific language in the guidelines that

actually restricts them to judicial functions, beyond the fact

that the guidelines themselves reference statutes that are not

purely related to judicial function.

    The very nature of the guidelines and the open framing of

this guideline and enhancement to include conduct of varying

seriousness leaves it open to the kind of conduct that we're

discussing in this case, which we would submit still does have

to do with the administration and obstruction of justice, even

though not with respect to a court.

        THE COURT:  Yeah, but I mean, this is a criminal

related provision.  So it has to be strictly construed; right?

Again, I could see if somebody has been identified as the

perpetrator of a crime, as was the *Thompson* case, and the person

flees and, therefore, causes the government to go to the expense

of tracking that person down and bringing them to justice, I

could see how that could be construed as obstructing justice.

    But here, when we're talking about a legislative procedure

or a legislative process that is designed for the sole purpose

of certifying the Electoral College vote, is that obstruction of

justice?

        MR. DIAMOND:  Your Honor, the commentary in defining

"administration of justice" does seem to have a three-prong
definition that covers all three branches of the government.
It's defined to include --

THE COURT:  Were are you referencing now?

MR. DIAMOND:  One moment, Your Honor.  Sorry.

So in the commentary of Section 2J1.2, Note 1 includes
definitions.  And the definition of "a substantial interference
with the administration of justice" includes -- and there's
three prongs to this definition -- "a premature or improper
termination of a felony investigation; an indictment, verdict,
or any judicial determination based upon perjury, false
testimony, or other false evidence; or the unnecessary
expenditure of substantial government or court resources."

The government agrees with Your Honor that one of those
three definitions does seem to dovetail with what you're saying,
with the judicial branch, but we believe the first part of that
definition, an investigation that isn't necessarily brought to
court deals with the executive function, and the third branch of
that definition, which more broadly refers to governmental
resources, is --

THE COURT:  And I don't disagree with you.  I didn't
mean to suggest that the provision is only intended to apply to
purely judicial-related proceedings.  I agree with you that if
somebody has committed a crime and they then engage in conduct
to try and avoid their detection or make it more difficult for

1    law enforcement to arrest them, I would agree that that type of

2    conduct would apply here.

3        But here, we're not talking about that type of behavior.

4    We're talking about attempting to undermine the electoral

5    process of the United States.  And it seems to me that that's a

6    different type of violation as compared to trying to do

7    something to subvert the criminal justice process.

8             MR. DIAMOND:  Well, Your Honor, again, the government

9    respectfully submits that to refer to subverting the judicial

10   process is still too narrow.  Whereas, the actual --

11            THE COURT:  And not the judicial, the criminal justice

12   process.

13            MR. DIAMOND:  Sure.  But even so, Your Honor, the

14   Electoral College certification which was occurring on January 6

15   should comfortably fall within the meaning of "administration of

16   justice," because Congress was performing an official function

17   required by the Constitution and by federal statutes.

18            THE COURT:  I hear you, and I know maybe my

19   colleagues, you know, have construed the provision differently.

20   But as I said, in the *Thompson* case, the reason I felt it was

21   appropriate there was because he had been identified as having

22   been engaged in a violation of the law and then fled.  And

23   obviously, that contributed to the government having to expend

24   additional resources in order to bring him to justice.  And I

25   think that would justify the enhancement.

1    But here, when we're talking about a purely legislative

2    formality that the Congress is obligated by the Constitution to

3    conduct and there's an attempt to subvert that process, I just

4    think when you consider the entire commentary collectively --

5    and it focuses on, it seems to me, activity that seeks to

6    subvert the criminal justice process -- to say that because

7    there was the destruction of property, not in the context of

8    subverting the criminal justice process but trying to subvert

9    the legislative confirmation of the electoral process, falls

10   outside of the scope of what this particular provision is

11   designed to address.

12        MR. DIAMOND:  Well, Your Honor, on that point, the

13   government's weary of the two different enhancements at issue

14   here, the plus 3 under 2J1.2(b)(2) for the substantial

15   interference with the administration, separate from the

16   enhancement in 1.2(b)(1)(B).

17        But as far as the limitation of the administration of

18   justice to interfering once the subject is already the target of

19   an investigation is too narrow, because the very concept and

20   definition of "substantial interference with the administration

21   of justice," referring to the expenditure of government

22   resources, opens it up to applying when the government spends

23   those resources outside of the context of, say, locating an

24   individual and bringing that individual to justice.

25        And we believe that in this case there was a significant

expenditure of government resources.  And that doesn't just include bringing the defendant to justice.  That includes the damages that the defendant caused and the resources the government had to expend in fixing the damage that the defendant caused to the Capitol building.

And that's not to mention the government resources that were expended on the police response that was required as a result of the actions the defendant took to subvert justice that day in the form of trying to stop the peaceful transition of power that was underway via congressional proceeding.

THE COURT:  But aren't there -- and I haven't looked at this specifically, but aren't there provisions in the sentencing guidelines that would provide for an enhancement for the destruction of property and that the amount of destruction would have an impact on what the guidelines are?

MR. DIAMOND:  Your Honor, the government is not prepared at this time to speak more broadly to those other provisions you may be referring to.  But the government submits that we don't have to look further than the guideline provision of 2J1.2(b)(1)(B), which does refer to property destruction and specifically cites 18 U.S.C. 1512(c)(2) for which the defendant was convicted.

THE COURT:  But I'm looking at the guideline provisions that deal with economic offenses.  And within that guideline 2B1.1, it does provide for enhancements based upon the

1   amount of the loss that was incurred as a result of the

2   defendant's conduct.

3       So it seems to me that when you have a provision that

4   specifically deals with an enhancement based upon the

5   destruction of property that a person engaged in, that that

6   would be the provision that would control and not a provision

7   that at least to me seems to be directed at a totally different

8   type of conduct.

9       MR. DIAMOND:  Well, Your Honor, the government would

10  argue that this is not an economic crime.  We're talking about

11  the obstruction of justice because the conduct the defendant

12  committed that he was convicted of was stopping a congressional

13  proceeding.

14      THE COURT:  Then let me just ask, because I know it

15  says somewhere that this is designed to deal with conduct that

16  amounts to obstruction of justice and those statutes that deal

17  with obstruction of justice, could he have been charged with

18  obstruction of justice based upon the conduct he engaged in?  I

19  don't think so.

20      MR. DIAMOND:  In this case, Your Honor?

21      THE COURT:  Yes.  Could he have been charged with

22  obstruction of justice under a federal obstruction of justice

23  statute?  I don't think so.

24      And I think the guideline specifically does say that it's

25  designed to address those statutes that punish for obstruction

1   of justice conduct and that these guidelines fall within the

2   sphere of those type of statutes.

3       And the query, could he have been charged with obstruction

4   of justice based upon what he did?

5           MR. DIAMOND:  The government submits that he would.

6           THE COURT:  I'd like to see what the circuit says

7   about that, but I assume there may be some issues before them on

8   that issue since other judges have ruled that it does apply.

9           MR. DIAMOND:  And the government would ask that until

10  the circuit rules differently on this question of the

11  application of obstruction of justice statutes to the conduct we

12  saw on January 6, that Your Honor would apply the enhancement in

13  line with what Your Honor did in *Thompson* and other judges in

14  this court have done in comparable cases.

15          THE COURT:  Like I say, I see *Thompson* as different.

16  Like I say, I did there consider the fact that he caused the

17  government to go to the expense of having to track him down and

18  bring him to justice, because he fled once he had been

19  identified by the police as having committed an offense related

20  to the Capitol.

21          MR. DIAMOND:  Your Honor, before we -- I don't want to

22  move on from this before addressing a different portion, a

23  different argument with respect to this same enhancement, unless

24  Your Honor would like to move on.  But regarding the intent

25  that's required to apply this enhancement, which is that

property damage or threats have to be committed with the intent
of intimidating or retaliating, the government just wants to
comment on that.

The defense has tried to split artificially the defendant's
conduct and separate out the fact that he tore the scaffolding,
the fact that he threatened officers or broke the window from
his overall course of conduct that day and the riot that he was
participating in when he committed those acts of property
destruction.

The government, to just back up a bit and put these actions
in context, submits that the defendant was committing one course
of conduct that day with one intent.  We already know the
defendant traveled to the Capitol with the intent to stop the
certification, and that's been admitted to in the Stipulation of
Facts.

But the facts independently show that throughout the
defendant's time on Capitol grounds during the commission of all
three of the activities at issue here with the plus 8
enhancement, he destroyed property and made threats with the
intent of intimidating Congress and to obstruct justice.

The government would also note that all three instances,
breaking the window, cutting the scaffolding, and threatening a
police officer with OC spray, are all independent bases to apply
the enhancement.  You only need to find one in order to apply
the enhancement.

1          Your Honor, when defendant showed up at the Capitol, he

2    came with a dangerous weapon.  He already had a knife on him

3    when he arrived at the Capitol.  And he arrived on the west

4    front where the police were standing with bike rack barricades

5    trying to hold back rioters from entering the Capitol.  And the

6    defendant saw this and joined these rioters in pushing police up

7    the stairs, underneath the scaffolding.

8          THE COURT:  And I agree, those are aggravating factors

9    that appropriately should be considered in deciding what his

10   sentence is.  But I'm just quibbling with whether they are

11   factors to consider under this particular provision of the

12   guidelines.

13         MR. DIAMOND:  Your Honor, following the -- again,

14   maintaining the government's position that the definition

15   of "substantial administration of justice" is open to the kind

16   of conduct we are discussing here more broadly, at a specific

17   level, the enhancement does apply to property damage and threats

18   meant to intimidate in order to obstruct justice.

19         And we see this as comparable to -- what defendant did is

20   comparable to breaking into a witness's home and destroying his

21   things in order to prevent testimony.  It's out of the judicial

22   context, but again, there's nothing in the guidelines themselves

23   that restrict us to a judicial context.  And the conduct did

24   have the intent and did have the temporary effect of actually --

25   of actually intimidating the members of Congress charged with

```
 1    carrying out a constitutionally mandated function --

 2            THE COURT:  I totally agree that what happened that

 3    day and the people who did it were un-American.  They were not

 4    patriots.  They were un-American.  They were seeking to try and

 5    subvert the electoral process, which is the foundation of any

 6    democratic society, and I find their conduct reprehensible.

 7        But that doesn't mean that I apply an enhancement that, it

 8    just seems to me, was not designed to address what he did.

 9            MR. DIAMOND:  Well --

10            THE COURT:  I understand, you know, but you're kind of

11    beating your head against a brick wall at this point.  I think

12    the next step may be go to the circuit and see if the circuit

13    has a different view.

14            MR. DIAMOND:  Your Honor, before moving on, the

15    government would also like to reference the case in *Rubenacker*,

16    21-cr-193, which was heard by Chief Justice Howell.  And she, in

17    a similar context, did not find that the administration of

18    justice was limited to the activities of courts or grand juries,

19    and she cited the Supreme Court in *United States v. Aguilar*,

20    515 U.S. 593, and specifically Justice Scalia's concurring

21    opinion that the omnibus clause was one of several distinct and

22    independent prohibitions contained in Section 1503 and -- oh,

23    sorry, and explain Justice Scalia's understanding that were the

24    due administration of justice to apply only to judicial and

25    grand jury proceedings, it would render that superfluous, and
```

1   thus, the majority opinion and the concurrence by Scalia

2   understood the administration of justice to be a broader

3   category.

4          THE COURT:   And what was the conduct there that was

5   under consideration by the Court?

6       Because again, I think you're taking out of context what

7   I'm saying.  I'm not saying it has to be limited to grand jury

8   or judicial proceedings.  I agree with you, to the extent, as I

9   said before, if a person has committed a crime and before the

10  case even reaches the courthouse the person engages in some type

11  of conduct that's designed to inhibit the ability of him being

12  identified or brought to justice, I would agree that that

13  conduct would be covered under this provision.

14      But what was the specific conduct that was in issue in that

15  case?

16         MR. DIAMOND:   Your Honor, I can't speak to the conduct

17  at issue in *Aguilar*.

18         THE COURT:   Because I think I need to know that to put

19  into context what Justice Scalia said.

20         MR. DIAMOND:   Your Honor, unfortunately, I can't do

21  that for you at this time, but I will note that Judge Howell did

22  apply that case with respect to *Rubenacker*, which was a

23  January 6 case.

24      And to just cite a couple additional cases where courts

25  have -- and now I'm going outside the January 6 context.

1    *Rubenacker* was in the January 6 context where Howell cited

2    Scalia and the Supreme Court there.

3         But outside the January 6 context, an enhancement based on

4    a definition of "the substantial interference with the

5    administration of justice" was applied where a defendant

6    withheld documents from a congressional subcommittee.  And we

7    think that's just another example where the legislative branch

8    and the function of Congress is not seen as wholly outside the

9    realm of what it means to --

10         THE COURT:  Do you know what legislation Congress was

11   considering in that case?

12         MR. DIAMOND:  I do not know the legislation Congress

13   was considering, but I can give you the --

14         THE COURT:  Again, I could see if the legislation

15   that -- it depends.  Again, I need to know more about the facts

16   of the case to assess whether I would agree that, you know,

17   engaging in some conduct that's trying to subvert the

18   legislative process amounts to obstruction of justice.

19         MR. DIAMOND:  Okay, Your Honor.  I will just, because

20   I don't think I did, provide the cite to that case, just for the

21   record, which is *United States v. Weissman*, 22 F.Supp.2d 187.

22         THE COURT:  Again, I might agree, thinking about it.

23   I mean, this hasn't been raised before.  But even in the

24   legislative context, if Congress is considering adopting or

25   whether it should adopt certain legislation and if somebody does

something to try and stop them from doing that, I could maybe
see a stretch where maybe that -- this provision would apply.

But here, we're talking about not an attempt by Congress to
enact a law, but we're talking about really a ministerial act of
certifying an election that's already been determined actually.

So the people who came and thought they could do something,
they were kind of ignorant, and those who encouraged them to
believe that they could do something were kind of ignorant,
because there was nothing that could have been done on that day
that could have stopped President Biden from becoming president.

MR. DIAMOND:  And, Your Honor, on that point, the
government would submit that the legislature, when carrying out
a constitutionally mandated administrative function, is not
operating so differently from a judicial body that this should
be taken completely outside of this what the government submits
is an intentionally broad definition of "administration of
justice."

THE COURT:  Okay.  I understand.  All right.

Anything Probation would want to add?

PROBATION OFFICER:  Thank you, Your Honor.

Nothing in addition to what we've included in the response
to the objections.

Thank you.

THE COURT:  Thank you.

I appreciate the arguments that are being made, and I

respect, obviously, the opinion of my colleagues.  But I do
think, consistent with what has always been the law, that
criminal-related statutes and rules have to be strictly
construed, and it seems to me when you consider the guideline as
a whole and the language of the guideline coupled with the
language of the commentary, that the Sentencing Commission was
concerned about activity of individuals that sought to undermine
or subvert the criminal justice or civil justice process.

And as I say, I don't think that's confined to just matters
that are actually before the Court or before a grand jury, but
even if the conduct occurs before the authorities even know
anything about the conduct and the person does something to try
and inhibit the ability of him or her from being identified and
brought to justice for the conduct that they engaged in, I would
agree that this conduct would apply.

And like I said, maybe even in the context of the
legislative process, if the Congress is considering adopting
laws and somebody tries to do something to intimidate or inhibit
the ability of Congress to enact that law or to force Congress
to act to adopt a law, I would probably tend to agree that this
would apply even though that's outside of the judicial process.

But here, when we're talking about a ministerial act that
Congress is obligated to perform under the Constitution but
really it is a ministerial act -- there was nothing that
Congress could do to stop President Biden from becoming

president because the states had certified under the Electoral College that he, in fact, had prevailed.

So I just don't agree with the proposition that what occurred here to try and stop that certification from occurring is something that these provisions of the sentencing guidelines was designed to address.

So over objection, I would have to conclude that the enhancements don't apply.

So without those enhancements, what would the guideline be? If you need some time, I can take a break so that can be done.

MS. VACA:  Your Honor, I hate to interrupt with something that's unrelated, but my client urgently needs to use the restroom.

THE COURT:  We will take a break so we can find out what the guideline would be.

MS. VACA:  Thank you.

(Recess taken from 9:59 a.m. to 10:07 a.m.)

THE COURT:  Okay.  Probation, have you been able to figure out what the guideline would be without the enhancements?

PROBATION OFFICER:  Thank you, Your Honor.

Yes.  The base offense level will be 14, provided the government agrees to the two-level reduction for acceptance of responsibility, which it's my understanding they do.  It would be a total offense level of 12.  And with maintaining a criminal history category of I, the guidelines range would be 10 months

1    to 16 months' incarceration, and the applicable fine range would

2    be $5,500 to $55,000.

3            THE COURT:  Thank you.  Anybody take exception to

4    what's been indicated?

5            MR. DIAMOND:  No, Your Honor.

6            MS. VACA:  No, Your Honor.  Thank you.

7            THE COURT:  Okay.  I will hear from government counsel

8    by way of allocution.

9            MR. DIAMOND:  Yes, Your Honor, and if you will indulge

10   me for a moment, I will try to connect my computer because the

11   government would like to play several exhibits in connection

12   with this.

13       Your Honor, before the government moves to a discussion of

14   the sentencing factors, we think it is necessary to give an

15   overview of the defendant's actions on January 6 with the aid of

16   video exhibits.

17           MS. VACA:  Your Honor, I'm sorry.  My screen's not

18   working.  Our screen here is not working.  Oh, let me see if I

19   can turn it on.

20           THE COURT:  The one up on the wall should be

21   operational, too.  So I don't know why it's not.  It should be

22   turned toward the audience if the audience can see it, but I

23   don't know if it's on.

24           MS. VACA:  This one is on now.

25           THE COURT:  Maybe we can get Mr. Cramer up and he can

1    look at it.  But we will need to proceed anyhow.

2         MR. DIAMOND:  Your Honor, before we even get to

3    January 6, it's crucial to keep in mind that defendant Watson

4    traveled to D.C. with two dangerous weapons:  A knife and a stun

5    gun.  The defense has stated that Watson had --

6         THE COURT:  Was the stun gun recovered?

7         MR. DIAMOND:  I can't speak to that.

8         THE COURT:  How do we know he had a stun gun?  I saw

9    that, but there wasn't anything in the stipulated facts about

10   that, but I saw in your sentencing memo that you said there was

11   a stun gun, and I just didn't know what the source of that

12   information was.

13        MR. DIAMOND:  I don't have that with me right now,

14   Your Honor.  I believe it was the FBI, but I can't recall

15   whether it was recovered or not.

16        In any event, Your Honor, on January 6 itself, once in

17   Washington, D.C., the defendant went to the Capitol with a knife

18   in his pocket.  So from the moment he entered Capitol grounds,

19   he had a dangerous weapon.

20        The defendant entered the Capitol grounds from the Peace

21   Circle to the west of the Capitol.  And as he approached the

22   Lower West Terrace, he was able to see that police officers

23   formed lines with bike racks and were attempting to keep rioters

24   from getting into the building.  And defendant's push to breach

25   those lines and get into the building began in earnest at

1   1:50 p.m., after he had reached the scaffolding on the north

2   side of the building, or the Senate side.  And underneath the

3   scaffolding was a set of stairs that led up to the Senate plaza

4   outside of the Senate.  And these stairs were defended by a

5   small line of police officers standing in the opening of that

6   scaffolding.

7         We're going to show a clip from Exhibit 3, which is a video

8   taken by another rioter that shows these rioters pushing against

9   that police line and forcing them up the stairs of that

10  scaffolding.  And though we won't -- I will point out when we

11  first see Watson.  He's in the middle of this group that is

12  rushing up the stairs right after the police are pushed back.

13        Your Honor, I'm playing Exhibit 3 starting at 21 minutes

14  and 15 --

15              THE COURT:  Excuse me.  Were you able to get in touch

16  with Mr. Cramer so he can come up and fix that?  Okay.  Go

17  ahead.

18              MR. DIAMOND:  Would Your Honor like me to proceed and

19  play the exhibit?

20              THE COURT:  Yes.

21        (Video played.)

22              MR. DIAMOND:  And we're pausing now at 22 minutes and

23  19 seconds.  And you can see this is the defendant in his pale

24  yellow hoodie with the long hair right in the middle of this

25  crowd.

1          THE COURT:  Circle that again where you say he was.

2          MR. DIAMOND:  Do you see my cursor?  That's the

3    defendant there.

4          THE COURT:  Okay.

5          MR. DIAMOND:  After the defendant and the other

6    rioters pushed into the scaffolding, the police were able to

7    form another line at the back of -- about halfway up the stairs

8    where the scaffolding cover ended.

9       Now, the scaffolding was covered by a cloth which limited

10   the movement of the rioters in the stairs under the scaffolding

11   and also limited the ability of rioters to move from the Lower

12   West Terrace into the stairs and up the stairs towards the

13   police and the Capitol.  And the police were blocking the only

14   opening in that scaffolding that led to the rest of the

15   staircase and the building.  So there was a standstill

16   effectively underneath the scaffolding.

17      And I'm going to play a clip from Exhibit 4, which once

18   again is a video taken from another rioter.

19         THE COURT:  I'm sorry.  What did you say was

20   underneath the scaffolding?

21         MR. DIAMOND:  A standstill of the rioters.  They were

22   stuck.  And I'm going to show you a clip from Exhibit 4, which

23   comes from another rioter there that day, and it will show

24   Watson in the middle of the standstill.  And I'm going to start

25   playing this clip at -- this video, Exhibit 4, at 3 minutes.

1      (Video played.)

2      MR. DIAMOND:  Your Honor, I'm pausing here at 3

3  minutes and 20 seconds where you see the defendant at the bottom

4  of the screen in the pale yellow hoodie.

5      THE COURT:  Okay.

6      (Video played.)

7      MR. DIAMOND:  Now, Your Honor, amidst this chaos, the

8  defendant was not content to wait around in the back of the

9  crowd as you see him here.  He was not a passive observer on

10  January 6.  He hoists himself up on top of the scaffolding and

11  walks over the crowd towards the front of the police line.

12    I'm going to skip ahead and play another clip from the same

13  video that shows this.  I'm starting the video again at 6

14  minutes and 30 seconds.

15      (Video played.)

16      MR. DIAMOND:  And your Honor, you can see that is the

17  defendant holding onto the scaffolding in the yellow hoodie.

18      THE COURT:  Okay.

19      (Video played.)

20      MR. DIAMOND:  And here you see him again walking

21  across the scaffolding.

22      (Video played.)

23      MR. DIAMOND:  While under the scaffolding, Your Honor,

24  as the defendant admits in paragraph 12 of the stipulated facts,

25  he cut the cloth covering, in his words, so that more rioters

could get through and reach the Capitol building.

At the top of the stairs -- or the middle of the stairs where the -- sorry.

Your Honor, at 2:10 p.m., some 20 minutes after the defendant first pushed his way into the scaffolding, the police line there broke, and the defendant and other rioters rushed up the rest of the northwest stairs towards the Capitol.  At the top of the stairs, the defendant and other rioters encountered yet more police.  They encountered more bike racks.

At some point, Your Honor, the defendant had obtained a can of SABRE Red OC spray, and he can be seen carefully examining that canister of OC spray at the top of the stairs as the crowd was confronting the police there.

I'm going to play another clip from Exhibit 3 that shows the defendant with the can of OC spray at the top of the stairs. Your Honor, I'm going to start the clip -- I'm going to start playing Exhibit 3 at 39 minutes and 30 seconds.

(Video played.)

MR. DIAMOND:  Your Honor, I'm pausing here at 39:37 where you can see the defendant in his pale yellow hoodie holding his can of OC spray.

THE COURT:  Okay.

(Video played.)

MR. DIAMOND:  Your Honor, I'm pausing here at 40 minutes and 19 seconds, because the next several seconds of this

1    clip are important, but they happen quickly.

2         You can see here how outnumbered the police are at the top

3    of the stairs, how they appear scared, and they move quickly

4    away from the crowd as the crowd kicks over the barricades.

5         And now I'm going to keep playing the clip.

6         (Video played.)

7              MR. DIAMOND:  And note that this is defendant Watson

8    in the pale hoodie again.

9         (Video played.)

10             MR. DIAMOND:  So you could see in that clip that as

11   much of the crowd seems to veer left from the top of the stairs

12   and head directly towards the Senate plaza, the defendant moves

13   in the direction of the police, holding the can of OC spray out

14   in front of him.

15        And although he -- in his sentencing memorandum, the

16   defense denies that he actually threatened the police.  What the

17   defendant told the FBI was that he wanted to communicate to the

18   officers "don't fucking do anything to me."  In other words,

19   this was a threat.

20        And the government would also note that when Watson was

21   first interviewed by the FBI, he didn't even mention that he had

22   the OC spray.  Only when interviewed a second time and shown a

23   photograph of him with the spray did he admit that he lied

24   because he was afraid of getting in trouble and admit that he

25   intended this spray to convey that message to the police.

1      I'm going to play this interaction between the police and

2 Watson with the OC spray from one more angle, from another video

3 captured by somebody at the Capitol that shows the same moment.

4 And this is Exhibit 8, and I'm going to start this exhibit at 10

5 minutes and 50 seconds, right after the rioters and the

6 defendants knock down the barricades and advance.

7      (Video played.)

8           MR. DIAMOND:  Let me just pause and say, what Your

9 Honor will see is that, again, as the crowd moves towards the

10 Capitol to the left, the defendant runs right towards the police

11 instead of the building.  And though the videographer will pan

12 away from the defendant and go towards the Senate building

13 himself, you will see for a moment that he pans back the other

14 way, and you will see Watson apart from the crowd staring down

15 the officers.

16      (Video played.)

17           MR. DIAMOND:  I don't know if you caught that moment

18 where it was just the defendant and the officers there.

19           THE COURT:  Right.  I saw it.

20           MR. DIAMOND:  Okay.  Next, Your Honor, the defendant

21 makes his way to the Senate Wing Door.  I'm going to let

22 Exhibit 8 play for another 30 seconds to show the rioters

23 approaching the door.

24      (Video playing.)

25           MR. DIAMOND:  And what you will see in this video is

as soon as these rioters get to the door, they start banging on the windows and breaking it.

Now, Your Honor, I'm going to show you footage from the Capitol's own security cameras, because it's a better angle showing the defendant breaking the window into the Capitol and in that way opening a crucial pathway for the rioters that were coming up towards the Capitol behind him.

This is Exhibit 10.  The defense memorandum minimizes the defendant's role in emphasizing that the window was already broken and the defendant just broke it on his way through.  But what you will see in this video is that the defendant very deliberately stands up on the sill of the window.  The top half of the glass was still intact so that only two rioters were able to slink through the open bottom portion with shards of glass still exposed.  And the defendant stands up on the sill and bangs on the top of the window sill until he and another rioter who was using a wooden beam completely punched through the rest of the window, therefore opening it up to the rest of the crowd.

And I'm playing Exhibit 10, which does not have sound, as it's a Capitol security camera.  And I'm going to start at 2 minutes.

(Video playing.)

MR. DIAMOND:  And here, Your Honor, pay attention to the window.  This is the window through which the defendant enters.

1    And you can see the rioters punch out just this bottom

2    corner at first and in order to get through, whereas people on

3    the other side of the door are coming in quickly, very slowly

4    crawling through this opening in the window.

5    I'm just going to pause it for a second, because the next

6    thing you are going to see, focusing on that window that the

7    person in the cowboy hat just crawls through, is you're going to

8    see a leg in the window.  That's the defendant stepping up.  And

9    then you're going to see the defendant's fist and his arm and

10   that pale yellow hoodie bang on the top of the glass.

11   (Video playing.)

12   MR. DIAMOND:  And then you can see, Your Honor, that

13   after banging on the glass and another person assisting with

14   this wooden beam, the glass is completely punched through for

15   the first time.

16   And now, Your Honor, you can see with the windows

17   completely punched through, much more quickly people are hopping

18   through the window and flooding into the Capitol.

19   You can also see, Your Honor, in this video that after

20   entering through the window, the defendant makes a left, and he

21   heads to the Ohio Clock Corridor.

22   And again, Your Honor, we're going to take a close look at

23   the defendant's conduct while inside the Capitol building.  The

24   defense argues at length in its sentencing memorandum that the

25   defendant should receive a significant downward variance,

although considering the guidelines now that he should be --
actually, the defense argues he should get time served because
his conduct in the Capitol was peaceful.

While we agree that the defendant did not assault anyone in
the Capitol, this is not a credit with respect to the crime of
obstructing Congress.  He violently broke into the Capitol, as
we just watched.  He was -- while thousands entered the
building, he was one of the few who physically himself took down
the barriers.

And had he assaulted officers, he would also be charged
with assaulting officers.  Not committing assault in addition to
obstruction does not warrant a downward variance or negate in
any way his violent entry into the building.

It's also important to note, Your Honor, that when the
defendant arrives in the Ohio Clock Corridor, it's 2:16 p.m.,
and the defendant is just outside of the Senate.  At this very
moment, police are calling over the radio that the Capitol has
been breached, only minutes before Vice President Pence was
evacuated, but members of Congress are still in the Senate.  As
the building goes into lockdown and members of Congress fear for
their lives, the defendant is just on the other side of the wall
with only a few officers between them.

Now I'm going to play a clip of the defendant in this
hallway right outside the Senate, a video taken by another
rioter.  And this is a significant video, because it shows the

1  defendant's interaction with the police and the crowd,

2  interaction which the defense has characterized as peaceful.

3  And while we agree the defendant is helping the police calm the

4  crowd, it's important to scrutinize his words, because while he

5  is calming the crowd, he is not actually on the side of the

6  police.

7      I'm now going to play Exhibit 13, and I'm going to start

8  playing it at 20 seconds.

9      (Video played.)

10      MR. DIAMOND:  Stopping the video now at 1 minute and

11  20 seconds.

12      Your Honor, let's break down what the defendant is actually

13  saying.  "The police are willing to work with us and cooperate

14  peacefully.  Gather more Americans under the condition that they

15  will come to gather peacefully to discuss what needs to be done

16  to save our country.  We will be heard."

17      The defendant is not trying to help clear the Capitol.

18  He's trying to bring more people in.  The defendant's actions

19  here are much better understood as him believing he was on the

20  cusp of getting what he wanted, direct contact with Congress.

21  This is tantamount to an armed robber breaking into someone's

22  home and saying no one needs to get hurt.

23      Having violently forced his way into the Capitol building,

24  standing outside of the senators where the senators and their

25  staff were barricaded inside and waiting to be evacuated, he was

willing to, in his words, discuss what needs to be done.

He had used violence to put himself and other rioters in a position of power over the police. That he did not commit additional acts of violence at this point is, again, not a credit.

And the defendant's mind-set here is further demonstrated by his actions going forward. Did he actually cooperate with the police and leave? No, he did not. He did not leave the Capitol. He did not lead others out of the Capitol. Others in the Ohio Clock Corridor left, but the defendant remained. He wanted to bring more people in.

The defendant stayed in that hallway just outside of the Senate for nearly 40 minutes. And this was significant for a number of reasons. As stated, the Senate had not yet been evacuated. Every minute that the defendant and others remained just outside of the Senate with the intent to meet face to face with members of Congress a grave danger was posed, especially because while the defendant may not have been trying to assault members of the police, others were, and he had led the way for them right up to the Senate.

Moreover, all throughout the Capitol, officers were scrambling to protect members of Congress, to evacuate the building, and many of those officers were being assaulted by the rioters who followed Watson into the Capitol. Every minute that the defendant remained outside of the Senate, officers had to

stay there.  Every minute that officers had to observe the
defendant and keep an eye on him, they were not able to help
their fellow officers where violence was more dire and danger
even more imminent.

And perhaps most instructive, Your Honor, of the
defendant's disregard for the police that day, even if he was
not assaulting them, was that once a second group of rioters
enters the Ohio Clock Corridor, some 35 minutes after the
defendant had first entered, and brushed right past the police
and walked right through them, the defendant joins them.  Once
the defendant had the numbers, he showed himself on the side of
the rioters, not the police.

And I'm going to show you that moment in Capitol security
footage, and that is Exhibit 12.  And I'm going to start this
at -- you can see the time stamp.  I'm going to start this at
2:41:29.

(Video played.)

MR. DIAMOND:  Your Honor, I just played a clip here to
show you can see the defendant here up against the police line
and that this is a point in which there's -- the police out-
number the rioters in this area, and you can see that the
defendant is not -- is not trying to surpass the police.

But now I'm going to skip ahead to 2:48 p.m., 36 minutes
and 15 seconds into this video, and you're going to see what
happens when reinforcements arrive in the form of more rioters.

1    Starting at 36 minutes and 15 seconds into the clip at 2:48 p.m.

2        (Video playing.)

3        MR. DIAMOND:  You can see all of the rioters entering

4    the hallway, and now they outnumber the police.  And so they

5    march right past that police line, and now you can see the

6    defendant following them and walking right by the police as well

7    with the rest of the crowd.

8        And while this crowd kind of stops at this point in the

9    hallway, what you don't see from this angle, Your Honor, is

10   there is another hallway that was completely blocked by a mix of

11   Capitol Police and also the Metropolitan Police, which at this

12   point, at about 2:50, had entered the Capitol to help fortify

13   it.  So the rioters did not have anywhere else to go.

14       I'm going to skip ahead one more time, Your Honor, to

15   2:53 p.m. at 41 minutes and 45 seconds into this clip.

16       And here, Your Honor, this shows the police having now

17   gained control of the hallway again.  Only the last remaining

18   rioters are still here, including the defendant, who you see

19   again in his yellow hoodie.  And the police are guiding these

20   last people out.  And it's only here, once the police have

21   control and have restricted the rioters to one area and guide

22   them out, that the defendant finally leaves over 40 minutes

23   after he first arrived.  And this is at 2:54 p.m.  The defendant

24   exits the building shortly after about a minute later through

25   the Senate Wing Door.

1          Your Honor, that's an overview of the defendant's actions

2     that day, and before the government moves on to discuss the

3     sentencing factors now, we want to briefly note that to your

4     question earlier about the stun gun, the defendant admitted that

5     he had taken it with him to D.C. to the --

6          THE COURT:  He admitted it?

7          MR. DIAMOND:  He admitted it to the FBI that he took

8     it with him during an interview he had on January 11.  But he

9     left the stun gun in his car, only brought the knife with him to

10    the Capitol.

11         Your Honor, in discussing the nature and circumstances of

12    the defendant's conduct, I would like to start by borrowing from

13    an opinion --

14         THE COURT:  Let me ask before you do that, the court

15    reporter, do you need a break?

16         COURT REPORTER:  I'm fine.  Thank you.

17         MR. DIAMOND:  I will try to curb my New York talking

18    speed.

19         I would like to start by borrowing from Judge

20    Kollar-Kotelly, who is more eloquent than I.  Just as heavy

21    rains cause a flood in a field, every individual raindrop itself

22    contributes to that flood.  In this context, Judge

23    Kollar-Kotelly explained that one January 6 defendant was part

24    of the flood waters that drowned the Capitol in insurrection and

25    destruction.

Although the defendant was certainly a willing participant in the violent mob that stormed the Capitol on January 6, he was not just another raindrop.  He himself opened the floodgates.

I will limit my time in expounding on the severity of January 6 as a whole, because Your Honor has already dealt with a number of these cases.  And as Your Honor well knows, the core of our entire nation, the institution of democracy sat on a knife's edge that day.  Had the defendant and those who joined him in insurrection achieved their goal on January 6, had the peaceful transition of power been stopped, this would have effectively created a dictatorship in the United States.

The defendant was not merely swept up in the current that day.  Though the defense minimizes his conduct, it's clear that he was an active and willing participant.  He arrived at the Capitol with a dangerous weapon, a knife that he carried with him to and into the Capitol.  He picked up a second dangerous weapon while on Capitol grounds, which he used to threaten a police officer and also took with him into the Capitol.

The defendant desecrated the Capitol.  Thousands of people flooded the grounds that day and entered the building, but he personally stood on a window sill and beat the glass until it gave way.

The defendant went through great effort that day to ensure that he was at the front of the crowd confronting police.  He hauled himself across the scaffolding to get to the front line.

He tore that scaffolding in order to let still more rioters through.  Just as when he broke the window, the defendant was not merely participating in a riot.  He was facilitating it.  He was encouraging it.  He was expanding his efficacy.  And he was doing so by destroying property.

And when the defendant finally made his way into the Capitol and was stopped by police just outside of the Senate, he remained for over 40 minutes until the police had control of the area and were able to lead him out.

The gravity of these actions cannot be minimized, and the nature and circumstances of his conduct demand a significant period of incarceration above the guidelines range in this case.

As for deterrence, Your Honor, a sentence's aim is twofold.  It has to deter both the defendant and the general public from engaging in similar conduct.

Here, general deterrence speaks to the need for a significant sentence.  On January 6, our institutions teetered on the brink of destruction.  And now the nation is watching these cases.  Meanwhile, the dangerous rhetoric that led to January 6 persists.  The threats to our democracy persist.  Next year, we will have another election.

The Court must send a message that democracy is inviable and those who would seek to destroy it will see severe consequences for their actions.  A message must be sent that violence is never the answer to frustration, no matter one's

1    individual beliefs.

2         With regards to the defendant specifically, the aim of

3    deterrence again warrants a significant sentence.  Mr. Watson

4    has already expressed a callous attitude towards the authority

5    of the courts.

6         In 2020, the defendant was arrested but released on a bond

7    in Alabama.  The trial in that case is set for later this month.

8    And the government is deeply concerned with the defendant's

9    response to that arrest and the prospect of his conviction.

10        As we provided Your Honor and defense in advance of this

11   sentencing, the FBI received a tip from Amazon Twitch.  Twitch

12   is a service where people live stream themselves playing video

13   games.  Amazon Twitch, in the course of monitoring its service

14   for dangerous activity, reported to the FBI that the defendant

15   stated the following while streaming himself playing the game

16   called "World of Warcraft":  "You know who's not going to prison

17   regardless of his fucking sentence?  This guy.  No.  Sorry.  If

18   you give me a 15-year sentence, I'm going to D.C. and killing

19   Joe Biden.  I'm just going to dedicate my life to that.  You can

20   take me out that way.  I'd rather just die in a blaze of glory

21   than do 15 years in fucking prison.  I might do something

22   meaningful.  Getting rid of China Joe, that would be nice."

23        While we don't have a video of these comments, we do have

24   the report from the FBI, which includes the user name of this

25   account, Magic Stays High, which is registered to defendant

Watson.  And the report also contains a screenshot of the stream which shows the defendant in that screenshot.

Now, the defendant said these words on December 31st, 2020. Less than one week later, the defendant traveled to D.C. to participate in the events of January 6.  Defendant, of course, was on bond and, as a condition of his release in Alabama, was prohibited from leaving the state.

So after making a threat to abscond justice and cause violence, defendant defied the conditions of his release and engaged in violence and destruction at the U.S. Capitol.

This lends credibility to the government's concern about the danger the defendant poses and the need for specific deterrence in this case.

The government also continues to have doubts about the defendant's remorse for his conduct.  The sentencing memorandum minimizes his conduct and his intent.  Moreover, in the aftermath of the events of January 6, the defendant took to social media to glorify his conduct.  He posted a picture of himself at the Capitol on Snapchat in order to dispel the idea that he was peaceful.  He was concerned with being seen as Antifa, and he promoted himself as the opposite, a participant in the violence and destruction of the day.  And that post is both reproduced in the PSR and in paragraph 16 of the stipulated facts.

The defense has also presented several characteristics of

the defendant that they believe warrant a lower sentence and time served.  However, the government does not believe that the defendant's history and characteristics support this special treatment.

The defendant has had significant advantages in his life that most people in this country do not, and most of the defendants in January 6 cases in particular do not.

When the defendant was expelled from high school for drug use, his parents enrolled him in private school.  He scored in the 82nd percentile on his ACT and was admitted to Auburn University, a top 100 university in the country, but he dropped out.

Where the defendant has been unable to work, such as after the revocation of his release in Alabama, his parents paid his rent.

Moreover, in 2020, in a year when many people lost their jobs, the defendant reported to the Probation Office that he earned $70,000 trading on the stock market.

I'm heartened to see the support that Mr. Watson has from his family.  It's the government's hope that after completing his sentence with the support the defendant is able to achieve his personal goals.  However, the government's position remains that the defendant's individual circumstances do not warrant a low sentence.

The government would also note on this point that the

1    defendant is not the sole caregiver for his child and does not

2    appear to be living with the child's mother.

3        Turning to the rule of law, Your Honor, promoting respect

4    for the rule of law also demands a significant sentence in this

5    case.  This relates to what we've already talked about, but as

6    Your Honor knows, what the defendant did on January 6 displays

7    the highest possible disregard for the rule of law in this

8    country, the very laws that provide him the opportunity to make

9    his case here.  In other parts of the world, the defendant would

10   not be provided that opportunity after such a dangerous and

11   destructive crime.

12       Moreover, the defendant showed a flagrant disregard for the

13   Court when he left Alabama in violation of his release

14   conditions in order to participate in January 6.

15       A significant sentence is required to demonstrate that in

16   this nation of laws, following the law is necessary.

17       And on this point, Your Honor, we would also note that the

18   defense requests the defendant be credited with time served,

19   citing the time he spent in an Alabama county jail following the

20   revocation of his bond.

21       That's a separate case.  While we don't believe the

22   defendant should be punished for his conduct that hasn't yet

23   gone to trial, we don't believe he is entitled to credit for

24   time spent in prison on that separate case, especially where he

25   was only placed in custody because his coming to D.C. to

participate in violence was a violation of his release
conditions.

And lastly, Your Honor, turning to the aim of avoiding
unwarranted sentencing disparities, we would like to discuss
several other January 6 cases.  While no other cases contain the
exact same balance of aggravating and mitigating factors, we
think a few provide suitable comparisons.  All involve
defendants convicted of 18 U.S.C. 1512 but not additional
assaults.  While we won't go through all of the cases we
mentioned in the sentencing memorandum, we want to highlight a
few.

One of them is the *United States v. Jacob Chansley*, Case
Number 21-cr-3.  Both the defendant and Chansley participated in
the violent surge that started underneath the scaffolding and
all the way up to the Senate plaza.  And you see the
defendant -- you see the defendant with Jacob Chansley, who is
recognizable in his Viking costume, in several videos.  Both
were of the first people to actually breach the Capitol.  Both
carried a dangerous weapon into the building.

Judge Lamberth sentenced Chansley to 41 months.  And yet
still, there are factors that make Watson's conduct more severe
than Chansley's.  While Chansley is very recognizable in the
media for his antics and for his costume, only the defendant
destroyed property in the Capitol.  Moreover, Jacob Chansley
provided a fulsome briefing to law enforcement, and the

defendant made the material omission about his use of OC spray to threaten the police in his first interview with the FBI.

Another comparison case is *United States v. Anthony Williams*.  In this case, which is 21-cr-377, defendant Williams was also a part of the first wave of the Capitol breach, although he entered six minutes after Watson.  Both supported a crowd that was pushing against police lines, although they didn't commit one-on-one assaults.  Williams did so in the crypt; the defendant did so on the steps leading up to the Senate.  Both took to social media after the events to glorify their conduct.

Williams had a higher guidelines range because he was convicted after trial and did not have acceptance of responsibility credit, and he was sentenced to 60 months, within the guideline range of 57 to 71 months.

And one more case the government wants to point out specifically here, as it was not in our memo, and this is a case we want to distinguish on the other end, somebody who was given a downward variance in circumstances we think were less severe than the defendant's.  This is *United States v. Hughes*, Case 21-cr-106.

He received the obstruction enhancements for threats for chasing Officer Goodman up the stairs and into the Ohio Clock Corridor where the defendant followed shortly thereafter.

However, there were three aggravating factors present here

1   that were not present there that warrant a higher sentence than

2   38 months.  Hughes did not have a dangerous weapon with him when

3   he entered the Capitol; the defendant did.  Hughes did not

4   engage in property destruction; the defendant did.  Hughes also

5   did not commit the offenses on January 6 while on bond for

6   another crime.

7       Overall, Your Honor, as we explain in the sentencing

8   memorandum more thoroughly, the defendant Watson, a significant

9   sentence is warranted for his activity.  And even if the plus 8

10  enhancement is not being applied for the property damage he

11  caused and the threats he caused in breaching the Capitol with

12  the intent to intimidate Congress and shut Congress down and

13  overturn the election, that is significant, a significant

14  aggravating circumstance, a number of significant aggravating

15  circumstances.

16      And if you weigh on one end the fact that the defendant did

17  not assault police officers and even crediting him with trying

18  to calm the crowd down for a moment, these aggravating factors

19  far outweigh the mitigating factors and warrant a sentence -- in

20  this case, Your Honor, given the guidelines range, we would

21  request an upward departure to still sentence him to 46 months,

22  which we believe best reflects the severity of his crimes and

23  consistency with the sentences of other defendants who pled

24  guilty to the same crimes or were convicted of the same 1512

25  crime and had similar circumstances.

1     Thank you.

2     THE COURT:  Do you know if that scaffolding covering

3     had to be replaced before the inauguration?

4     MR. DIAMOND:  Sorry.  What was that?

5     THE COURT:  Do you know if that scaffolding covering

6     that he cut had to be replaced before the inauguration and how

7     much it cost to do that?

8     MR. DIAMOND:  I believe it was, but I can't speak to

9     that estimate from the Architect of the Capitol at this time.

10     THE COURT:  And you're asking for a fine in what

11     amount?  10,000, you say?

12     MR. DIAMOND:  The restitution we are asking for right

13     now is 12,000, reflecting an estimate that the damage to each

14     window in the Senate Wing would cost about $10,000, including

15     not only the glass but also the damage to surrounding components

16     of the window and the cleanup costs.  So between that and we've

17     been asking in all of these cases for $2,000 of restitution for

18     the damage caused to the Capitol, so the two of those figures

19     together are 12,000, and that's what we're asking for in

20     restitution.

21     THE COURT:  Thank you.  I will take a ten-minute

22     break.

23     (Recess taken from 10:58 a.m. to 11:13 a.m.)

24     THE COURT:  Okay.  Defense counsel, you may proceed

25     with your allocution.

1          MS. VACA:  Thank you, Your Honor.

2      I actually also had intended to call as a mitigation

3  witness Jason Watson to the stand.  Would you rather I make my

4  argument first, or would you rather --

5          THE COURT:  Who is that?

6          MS. VACA:  It's my client's father.

7          THE COURT:  It doesn't make any difference.

8          MS. VACA:  All right, Your Honor.  I will call Jason

9  Watkins to the stand, then.

10          THE COURT:  Okay.  He can come up and take the witness

11  stand.

12          JASON WATSON, WITNESS FOR THE DEFENDANT, SWORN

13          MS. VACA:  And, Your Honor, this witness is offered to

14  provide character evidence and 3553(a) factors.

15                    DIRECT EXAMINATION

16          BY MS. VACA:

17  Q.  Mr. Watson, if you could state your full name for the

18  record, please.

19  A.  Jason Eric Watson.

20          THE COURT:  Are you fully vaccinated?

21          THE WITNESS:  No.

22          THE COURT:  Keep your mask on, then.

23          BY MS. VACA:

24  Q.  Can you tell the Court -- well, obviously, you're

25  Mr. Watson's father; correct?

1   A.   I'm his father?

2   Q.   Yes.

3   A.   Uh-huh.

4   Q.   And you traveled here today from Alabama to attend this

5   court hearing; correct?

6   A.   Yes, and my wife did as well.

7   Q.   Okay.  And her name?

8   A.   DeAnne Watson.

9   Q.   Can you tell the Court a little bit about what you do for a

10  living?

11  A.   My wife and I are business partners.  We publish parenting

12  magazines in various communities around Alabama and Florida and

13  a Christian publication also.

14  Q.   Can you tell the Court a little bit about Mr. Watson, I

15  guess his upbringing?

16  A.   I mean, fairly -- well, I don't know if it was normal these

17  days, just a two-parent home.  We were fortunate enough, because

18  we work together and have a business, we work from home a lot in

19  our home office.  So we've been very flexible and been allowed

20  to spend a lot of time with our son, Will.  Typical field trips,

21  I get to go on them, she goes on them, coaching his little

22  league teams, you know, being together in that way, so very

23  intimate as parents and close relationship.

24       I was even thinking about this, it didn't even dawn on me

25  thinking about this, being here in D.C. this morning passing by

1    the Capitol, which is quite humbling.  If you don't live here,

2    you're not used to seeing that.  But when Will was a senior, he

3    and I took a trip alone here to visit the Capitol and to see the

4    various historical monuments and to take in what's special about

5    our country.  So I thought about that and even looked a picture

6    up of us two last night.

7        But that was our -- that's the kind of relationship we had,

8    traveling together, spending time together as father/son, with

9    his mother as well.

10       He also grew up -- he mentioned some of the schools.  He

11   was a part of good schools.  He was a good student.  He's a kid

12   that was reading biographies about Lincoln and Kennedy growing

13   up in middle school.  He is -- I will say that he is -- not just

14   because we're here.  Anybody would say it about him.  He loves

15   his country, always has, and it's just how we've raised him.

16   Q.   Now, you mentioned school.  And as the attorney for the

17   government mentioned, Mr. Watson attended Auburn for some time,

18   and then I think he ceased his education.

19       How did you feel about that aspect?

20   A.   Well, if you don't mind, you asked me that, too, but I

21   just -- can I answer something else, though, or just say

22   something?  He also said he was expelled in high school for

23   drugs or something, which that is not true at all.  That did not

24   happen.

25       But anyway, back to your question.  Auburn?

1    Q.   Yes.

2    A.   How did I feel about him --

3    Q.   Yeah.  He was a good student in elementary and high school,

4    but his college education kind of seems stunted.

5         How did you feel about that?

6    A.   We didn't necessarily mind that, you know.  Frankly, I'm a

7    guy who it took me a while to go through college.  My wife

8    didn't graduate college.  We own our own business and do very

9    well.  So we don't see that as a ticket towards success.

10        And so when he decided he needed to take a break and he

11   wasn't applying himself well, we thought it was a wise decision

12   for him to make until he was ready to do that again.

13   Q.   Okay.  So let's move forward to the January 6 situation.

14        When he came out to D.C. to go to January 6, were you aware

15   he was coming out here?

16   A.   Yeah, I was.  He actually called me and said he wanted to

17   borrow some camping gear.  He said, hey, we're going to go camp

18   on the Mall and go to this rally.  And we don't follow that type

19   of political leanings, and I didn't even know it was happening.

20   And so I said, okay, what's this about?  He said, well, they're

21   meeting up there, and I was going to borrow some stuff, and we

22   can come by and get it.

23        So that's how I learned about it.  I thought -- I did say,

24   hey, you know, be smart when you're there, you know.  I knew in

25   terms of how people were thinking at that time was, you know --

1      I think a lot of deception was being put out there by the

2      president at that time.  And so I really didn't want him getting

3      caught up in that.

4           But we were aware, and I actually told him, I sent him a

5      text that morning, and I said, hey, enjoy being an American,

6      this is a part of -- you can go up as a citizen to our Capitol

7      and enjoy that process.

8           So we thought that was a neat experience for him to get

9      to -- obviously, once we all started watching this thing unfold

10     on TV, that's not what we were expecting.

11     Q.   Right.  So let me ask you about, I think, since this

12     incident, since Mr. Watson came up here and came into the

13     Capitol without -- unlawfully, obviously.  You saw the video.

14     What has been your observations about, I guess, Mr. Watson, his

15     political beliefs or his thoughts about being involved in this

16     offense?  Like, has he been able to communicate with you about

17     that since the time of his arrest here?

18     A.   Yes.  We've had lots of talks about it, and not just since

19     we've been here but since that time.  It's one where I think --

20     I agree with Your Honor about it being ignorant and what was

21     going on that day, and I think it didn't take long for Will to

22     figure out that as well.  Being a Trump supporter like he was

23     and then within -- we're sitting around our house at a family

24     get-together afterwards, and we have other supporters in our

25     family, and Will is calling President Trump a clown.

So that's one of those, for me, that's very positive, to
see those type of changes in him.  Because you want him to
recognize the foolishness.  As a parent, that's what you want to
see.  You want to see, okay, you do something stupid, but how
are you now picking up and moving forward.

And even since he's been here, again, for me, just because
I'm not a fan of the -- I don't want to get too much into those
politics, I guess.  But one of the things like on talk radio,
you know, when he was detained because he came up here, in Lee
County in Alabama and had to go back into that county, he
listened to talk radio.  That was a way to kind of feel, I
guess, get a sense of the outside.

But he told me, what, a couple months ago, he said, dad, I
can't even listen to talk radio anymore.  And I perked up my
ears.  I like hearing that, because I'm not a fan of what goes
on there.  He said, it's just so divisive.  He said, if I was a
liberal and I tried -- this is what he told me.  He said, if I
was a liberal and tried to call in and all they wanted to do is
call me names and tell me I'm stupid, then how can we move
forward as a country?  We can't learn together if that's how
people are.  So he said, I can't even stand listening to them
anymore.

So that's one of the things, when you talk about changes in
terms of that mind-set, because I think the other mind-set, the
opposite of that, you know, is what had people, including my

1   son, believing in the foolishness of that day on January 6.  And

2   so to see those changes, that's powerful.  That's what you want

3   to see as a dad and as a mother as well.

4        And I think part of that is just recognizing it, but then

5   also knowing, I've got to get on with my life, and I've got to

6   move forward.  A lot has changed.  We're talking two years ago

7   now.  And so I mean, his career, how that's changed, him with

8   his daughter now.  She just came home from the hospital on

9   Sunday.  She was born early.  So she just came out of the NICU.

10       But having that type of focus and the change, I know that's

11  a big part of really probably what's helping him to see that

12  kind of stuff and to see that this is not a way forward and to

13  see how you can kind of be duped by the propaganda.  It's kind

14  of what it is.  It's just propaganda.  So you can be duped by

15  that.

16       It's very positive for myself, for his mother to see these

17  kind of changes.

18  Q.   I was going to ask you about his child, but you already

19  mentioned that.

20  A.   Yeah.

21  Q.   She just came home, meaning home with her mother, when?

22  A.   Sunday, yeah.  And we've been -- obviously, we've been a

23  big part of her life.  You can only have four people in the NICU

24  to care for the baby, and my wife has been able to go there.

25  And when the mother had COVID recently, my wife went every day

1    and fed the baby the bottle.  So we've been very involved.  It's

2    our first grandchild.  So we're excited about that.

3         But yes, she did come home.  We just were there, and I got

4    to hold her for the first time on Tuesday, not that you're

5    asking all of that, but it was exciting.

6    Q.   Now, can you -- I think you covered a lot of the things I

7    was going to ask you.

8         Is there anything else that you think is important or you

9    would like the Judge to know before he imposes sentence on your

10   son?

11   A.   No.

12             MS. VACA:  I don't have any more questions for you,

13   but the attorney for the government may have questions.

14             THE WITNESS:  Sure.

15             THE COURT:  Government counsel, any questions?

16             MR. DIAMOND:  No questions, Your Honor.

17        But there was one just factual point made about his school

18   record, and I just want to point Your Honor to page 13 of the

19   PSR which does contain the facts as the government had mentioned

20   earlier.

21             THE COURT:  I did see that.

22             MS. VACA:  They do contain that, Your Honor, and I did

23   not object to that based on -- I mean, we went over the PSR, and

24   obviously, a lot of it was focusing on the legal objections.  So

25   I apologize for that.  I should have objected to that, but I

didn't.  I wasn't aware of that, and I apologize.

THE COURT:  I saw that discrepancy, but I don't think that really factors into what my sentence would be, in any event.

MS. VACA:  I think you can get up.

THE COURT:  Thank you, sir.

THE WITNESS:  Thank you.

MS. VACA:  And, Your Honor, I wanted to -- I submitted my sentencing memorandum, and I know this may also not be important, but I want to correct a factual misstatement that I made in my sentencing memorandum when I was talking about the -- when Mr. Watson was addressing the other protestors and he was using the little -- I don't know, that little microphone thingy.

In my sentencing memorandum, I said it belonged to the police, but upon looking at the video from another angle, I saw that he actually had that little speaker from one of the other protestors.  I just wanted to correct my factual misstatement.

THE COURT:  Thank you.

MS. VACA:  Uh-huh.

Now, as far as my sentencing recommendation -- and actually, before we go there, I wanted to correct the record in a couple other areas, too, as far as a couple of the things that the government said during their argument.

One was that Mr. Watson said in his own words that he cut the scaffolding so people could move through, so they could get

through to breach the Capitol.  He did not say that.  He said he
did cut it so that people could get through, but he did not say
so that people could breach the Capitol.  Your Honor, at that
point, no one was breaching the Capitol yet.

Now, just in general, I don't want the sentencing
memorandum to seem like I am, you know, minimizing his conduct.
I mean, I volunteered or, I guess, I was voluntold to do this
case because there were so many cases out of this district.  But
obviously, just as Mr. Watson noted, just like all the other
Americans, I watched this unfold on TV.  I mean, I don't think
it's any secret to Mr. Watson, my political views are completely
opposite of his.

However, the reason for the sentencing memorandum and the
arguments that I make are to, I think, put -- a lot of the
argument was about the enhancements and whether the conduct
warranted the enhancements.

But I should say, Your Honor, that when we look at these
videos and the chaos and everything that was going on at the
time, I don't think anyone in this courtroom was present when
that was going on.  And let me be clear.  Mr. Watson has
acknowledged that he did wrong, and he does not condone his own
behavior or believe what he did was correct or, you know,
breaking the rest of that window and coming through.

But I think the issue is, what happens when you get into
the Capitol.  When he came into the Capitol, Your Honor, that

1    was the offense really that began this whole delaying of the

2    electoral vote, the interruption of that, the obstruction, the

3    charge for which he's been convicted.

4        But I think to say, Your Honor, that the fact that he took

5    the position that he was going to interact with other protestors

6    and try to calm them down, even though he was speaking to the

7    people, it was all about peace.  Does that make it okay that he

8    came in?  Does that make it okay that he was a part of this

9    situation?  No, it does not.  But if there's something that

10   separates or, I guess, mitigates the sentence that this

11   defendant should receive, I think that's one of the things that

12   the Court can look at.

13       Because no one in this courtroom was present when he was

14   involved or interacting with the police, I think we should give

15   tremendous credence to the statement from the police officer

16   that I put in my sentencing memorandum.  He specifically

17   remembered Mr. Watson in an interview with law enforcement, with

18   federal law enforcement, and said that Mr. Watson was quiet,

19   reserved, and appeared to be receptive to everything the police

20   officer was saying, and he was eager to help calm down the

21   crowd.  He said he felt a special bond with Watson while he was

22   trying to communicate with the crowd.

23       And the PSR is clear that Mr. Watson was in an area of the

24   Capitol.  When he was escorted by the police, that's when he

25   left.  They were being escorted at various times because that's

when -- I think he was just trying to be helpful, and he was there with the police, and they escorted him out.  When he was escorted out, he left.

That doesn't change the fact that he committed the offense. I understand all that, and I'm not trying to argue that.  But I do think the Court should look at specifically the observations of somebody who was there charged with keeping peace within the Capitol building and their observations of my client's conduct while he was in the Capitol building.  That's one of the reasons for the downward variance that I noted.

While age is -- I mean, he was 23 years old when he committed the offense.  Again, it doesn't excuse it.  It doesn't make it not a crime.  But ultimately, Your Honor, I think it's -- well, it's science really that the brain is not developed fully until the age of 25.  And this impacts a lot of executive function as far as decisionmaking, planning, and impulsivity.

I will say, Your Honor, in the time that I've known Mr. Watson, I've seen a lot of growth.  I think that before this offense happened, before he, you know, had to go back into jail at Lee County, I'm asking the Court to consider his pre -- his presentencing conditions, because the Court can consider that. He was -- he had violated the conditions of his release.  That is absolutely true.  And that was because of his conduct here. So he went into jail and sat in the Lee County Jail for four

months.  And after he was released from the Lee County Jail, he was placed on an ankle monitor at his own expense, quite expensive, actually.  And he did that so that he could try to get to work.

And I think this is an example, Mr. Watson is an example of someone who, you know, made very bad choices and had to figure out that he needed to grow up.  Because while he wanted to do culinary arts and he had some jobs, as you can see the PSR reflects, he wasn't -- he didn't have the level of jobs that he did once he got down to business.  He was working for Central, a very nice restaurant in Montgomery.  He was working at Lucy's, and then most recently, he had another job at a fine-dining establishment in Auburn when he was taken into custody on this case.

He's shown that he's really committed now to being productive, and I think his actual efforts and his actual conduct show that.

And the reason why this is important, Your Honor, is because while the sentencing guidelines give the Court some guidance as to what the appropriate sentence should be and in his case that the guidelines suggest it's 10 to 16 months, but obviously, the Court considers other things, aggravating factors and mitigating factors.

And I think one of the dangers of, I guess, someone who may have, I guess, believed this crazy misinformation that was being

spoken into existence by the president, all these people who believed in him at the time, is would the person still hold fast to those beliefs.

Mr. Watson does not agree. I feel like he feels very duped. I mean, he did the thing. He went into the Capitol. I mean, the president wasn't there telling him to go in. But ultimately, Your Honor, it was his belief system that at the time enabled him to do the instant offense, and as his father testified, he doesn't hold that.

Your Honor, I think that the Court, under 3553(a), imposes a sentence that's sufficient but not greater than necessary to reach the goals of -- the sentencing goals of 3553(a). And yes, part of that is deterrence, deterrence for this defendant, deterrence for other individuals.

I think in general, the mass of prosecutions that have taken place since this incident clearly show that this type of conduct will not be tolerated. But, Your Honor, I'm asking the Court to consider Mr. Watson's mitigating factors, the changes in his circumstances. He's a father. And whether his parents can help support that child or whatever argument, I think, was made, she still has the need for -- to even meet Mr. Watson. She hasn't even met her own father.

And again, I know that's because of his conduct, Your Honor, but still, I ask the Court to consider all these mitigating factors, and the time that he has been incarcerated,

which was four months in Auburn -- I'm sorry, in Opelika, in Lee
County, Alabama, and then since the time of his trial here, the
conditions at the jail here in Alexandria, specifically for the
January 6 defendants, I think the Court's already aware through
Mr. Thompson's sentencing in that they're on a lockdown except
for two hours a day.  And the Court can consider all of that in
imposing sentence as well.

So, Your Honor, I would ask the Court to impose a sentence
of time served with a sentence of supervised release to follow
with whatever special conditions the Court wants to impose.
Mr. Watson is willing to meet those conditions, Your Honor.

So I think I will leave my argument there.  And I am pretty
confident Mr. Watson wanted to address the Court.

THE COURT:  What's your response to the government's
revelation about the statements your client made on
December 31st, 2020, when he was playing his video game and very
disturbing statements about wanting to kill the president, our
current president?

MS. VACA:  I mean, I agree.  They're disturbing.  I
don't condone them, obviously, Your Honor.  He's playing a video
game.  It doesn't make -- again, I'm not trying to say hey, it's
all right, go ahead and say this, but he's literally on a video
game and probably talking to some other person who shares these
type of views -- or shared these views about Biden at the time.

I mean, I would say they're rhetoric, but I would say that

mostly based on what his conduct was when he came in.  Like

conduct, I think, matters.  The conduct, what he actually did

when he came into the Capitol shows he wasn't trying like hey,

move out of the way because I have to break through and do

whatever I have to do to get Joe Biden because I'm going to kill

him.  That, I think, would be much more alarming.

I don't think it's okay to want to kill the president.  I

wasn't a fan of some presidents, but I didn't really want to

kill them.  But I don't think that he meant to really kill

anybody.

So I am disturbed by that, Your Honor.  I don't think it's

great.  I don't know that he would do that now.  But again, if

I'm on a video game platform probably playing with other people,

I don't know that that -- the statements were, you know, a

premonition of what he wanted to do.

THE COURT:  That's, unfortunately, the world in which

we live.  I mean, I, unfortunately, get threats on my life all

the time in these cases also.  It's a sad reality in the world

in which we live now.  You do your job, and your life gets

threatened.

MS. VACA:  Yes.  I mean, obviously, Your Honor, my own

thoughts regarding, you know, I guess, his thoughts about Joe

Biden, but I mean, he's able to have those thoughts.  He's

able -- he wasn't -- I mean, he's on a video gaming whatever

playing with some other person.

1    I'm going to admit, I don't know that much about Twitch or

2    whatever the heck that is really, but my understanding is you're

3    kind of interacting with other people who are playing the game

4    at the time.  So he would have been communicating with, I guess,

5    someone else who may share similar views about Joe Biden.

6    But I would think, Your Honor, ultimately, the special

7    offense characteristics, the offense -- the things that actually

8    happened at the Capitol, I mean, very disturbing, obviously.

9    I'm not -- I don't want to minimize the aggregate effect of what

10   happened, but ultimately, Mr. Watson is here to be sentenced for

11   his conduct.

12   And I think, Your Honor, an important thing to note

13   regarding some of the sentencings that have gone forward,

14   including Jake Chansley, I believe Jake Chansley, if I'm not

15   mistaken, he entered a plea agreement.  I had looked at his plea

16   agreement a while ago, but he did agree to -- the sentencing

17   enhancements were applicable to him.  His guideline range was 41

18   to 51 months, and he got the bottom of his guidelines.

19   I don't know what the calculus was in determining that

20   sentence, but I think ultimately, though, the Court in this

21   specific instance looks at Mr. Watson's conduct and his

22   mitigating factors.

23   I would note also that when the Court sentenced

24   Mr. Thompson, the Court gave Mr. Thompson a substantial downward

25   variance.  The government was requesting a sentence of 70

1   months.  I believe his guideline range was 70 to 87 months.  And

2   the Court imposed a sentence of 36 months.  Mr. Thompson went to

3   trial.  Mr. Thompson lied under oath.

4       Mr. Thompson -- and again, I mean, I have my own thoughts

5   maybe about how Mr. Thompson's trial unfurled.  I don't -- I'm

6   not trying to speak poorly of Mr. Thompson.  I don't know him.

7   But these are significant differences between my client and

8   Mr. Thompson and just kind of maybe shows, I think, long term

9   how he regarded his conduct even going forward after January 6.

10          THE COURT:  This is the first case I've had where

11   somebody had made statements of a desire to kill our president.

12          MS. VACA:  I understand, Your Honor.  And I would ask

13   the Court to consider the format in which they were said and

14   that they weren't a part of the offense conduct in this case.  I

15   mean, I don't think it's respectful.  I don't think it's

16   appropriate to say those things.  But I would ask the Court to

17   consider that they're being said on what I think he would think

18   is a private communication with whoever else is playing this

19   video game with him.

20       Again, I'm not condoning the words, but there's no --

21   there's nothing there to show that it's a credible threat.

22   Again, I would say if his conduct lined up with that, when he

23   got into Capitol building and he -- I'm going for Joe Biden or

24   any of those other people who think like Joe Biden and he showed

25   danger and aggression then, then maybe that was.  I guess the

1    Court could believe that that was just him forecasting what he

2    planned to do.  But quite frankly, that's not what he did when

3    he got in the Capitol.

4              THE COURT:  Okay.  Does your client desire to say

5    anything?

6              MS. VACA:  Yes, Your Honor.

7              THE DEFENDANT:  Your Honor, just regarding the

8    statements I made on the 31st on Twitch, I believe the Secret

9    Service agent and the FBI agent I spoke to about that would

10   confirm the terror that they saw in my eyes when they showed me

11   that clip, that I didn't remember, because sadly, I was

12   extremely inebriated.  That's not an excuse at all.  But it was

13   a pattern for me at the time.  I got really drunk, and I made

14   really stupid and in extremely poor taste jokes with my friends

15   when I played video games.

16        In no way am I excusing myself, but I was terrified to see

17   it, and I believe that the agents agreed that it wasn't a

18   credible threat simply because of -- they could see the remorse

19   that I had for it.  I'm so remorseful for that to this day.

20        Regarding my actual case and everything else that's been

21   said here today, I really don't have anything to say other than

22   how just sorry I am for what I've done.  The time that I've

23   spent here, the time that I spent in Lee county, and the year

24   and a half I spent on very restrictive ankle monitoring gave me

25   plenty of time to think, especially here being in a solitary

cell for so long.  I had nothing to do really but think about how destructive my actions were and how destructive my mind-set was.

I really just only want to say that I'm terribly sorry.  I love this country, and my love for it leads me to that sorrow.

THE COURT:  You can stay where you are.

Sentencing is a difficult thing for judges to have to do, Mr. Watson.  It's something that comes with the territory, but it's not easy.  And there are a lot of factors, obviously, I have to take into account as required by both the sentencing guidelines and by the United States Code.  And one of the things, obviously, I have to look at is the nature of the conduct that the person has been convicted of or pled guilty to, one of the two.

And I just don't understand the mind-set of people who sort of become, I guess, like a part of a cult, who are prepared to do the things that took place at our Capitol on January 6, 2021.  I mean, it's distressing that people would be willing to do the things that they did to destroy our country, because regardless of the flaws that we have as a country, and we have many, I think by and large, it's a great country.

And for people to have reached the point where they were prepared to do the things that happened on January 6 that you are an integral part of, it's just sort of mind boggling to me.  I don't understand that mentality.  There have been people who

1   have been in political offices who I didn't like and didn't like

2   what they did, but I never thought that we would get to the

3   point where people were prepared to kill on behalf of someone

4   just because they have a different political perspective that

5   maybe you don't like.

6       I mean, to associate yourself with the people who came here

7   on that day, I mean, I've never seen a situation where people

8   are carrying not the American flag but Trump flags.  That's

9   scary stuff.  But not only Trump flags, but confederate flags.

10  The confederates lost.  The confederates were not patriots.  But

11  yet, people still rally behind a confederate flag, a flag that

12  was designed to try and keep people like me from being who we

13  are in this country.  But yet, people riled up behind it, you

14  know.

15      I mean, our electoral process, I don't know that we will

16  ever get back to a situation in this country where people are

17  prepared to accept the results of an election, and that's scary.

18  Can we survive as a country?  What if the next time the

19  Democrats lose, so you get people who want the Democratic Party

20  to be in power, so they take the same perspective, that we're

21  not going to accept this, and therefore, they riot?  Or if next

22  time again the Republicans lose and those who are supportive of

23  the Republicans, rather than accept the reality -- I mean, Trump

24  lost by 7 million votes, but yet -- and there are 60 judges, 60

25  courts that have rejected the allegations that somehow the

1   election was rigged.  But despite the empirical evidence that

2   showed that Trump lost, people like you were prepared to travel

3   all the way here.

4        Fine, our country encourages people to, you know,

5   peacefully protest.  That's a part of the American way.  But to

6   come all the way up here -- and you say you were drunk when you

7   made these statements.  I don't understand how somebody could

8   get drunk who could say they wanted to kill another person, let

9   alone the president of our country.  I don't know if you meant

10  it.  I would hope not.  But when people say things, sometimes

11  you have to believe what they say.  And even if you didn't mean

12  it, what message were you disseminating to other people who may

13  have heard it?

14       I mean, that's scary stuff, and we live in a world now, as

15  I said before, you do your job, and your life gets threatened.

16  That's the way -- that's the American way now with a lot of

17  people.  If they don't like what they -- if they don't get what

18  they like and want to happen, they say, well, I'm going to kill

19  that judge, or I'm going to kill that president, or I'm going to

20  kill that governor.  What kind of a world is that?  It's scary,

21  especially with all these guns we have now.

22       I hope you have changed your thought process.  I don't know

23  if that's true or not.  I hope that's the case.  And I'm not

24  saying who you should support or who you should not support.

25  Support whoever you want.  But supporting someone and then

1    acting out in the way that you did and others did on that day,

2    because I agree with Judge Kotelly, it was a mob mentality.

3    People individually probably wouldn't have done what they did, a

4    lot of them.  But you get a whole group of people together who

5    have these perverse perspectives, and all of a sudden, we have

6    what happened on that day.

7         One point something million dollars in our tax money, with

8    all the problems that we have in America, that we need to take

9    care of poor people who can't even buy food, but yet, we have to

10   now expend all that money to fix the Capitol that maybe we could

11   have given to people to help them live a decent life.  I mean, I

12   don't understand the thought process of people who did what they

13   did.

14        And your role, you know, you played a significant role.  I

15   mean, cutting the tarp in order to give people access, maybe if

16   you hadn't cut it, maybe things wouldn't have gotten as bad as

17   they did.

18        Yeah, the window was partially broken, but you contributed

19   to breaking it further and making it accessible so more people

20   could come in.  They weren't able to come in when that window

21   was even partially open.  But once you assisted in breaking it

22   totally, the flood came in.

23        And you came up here with weapons.  You found the weapon,

24   and you pointed it -- I saw it on the film.  You pointed it at

25   the police officers.  And you're the same type of person, I'm

1    sure, that would say, I support the blue.  But those cops were

2    terrified.  140 of them were injured.  Several of them committed

3    suicide.  One died as a result of the trauma he experienced that

4    day.

5           That's what you all did.  That's what you did to America.

6    That's the image you created for America.

7           I was over in Africa a couple weeks ago teaching, and

8    you've got people over there saying, what's wrong with your

9    country, what's wrong with your people.  I don't have an answer

10   to it.  I don't know why people did what they did.

11          Some things -- you can't just sometimes erase what you did.

12   Like my mother always told me when I was growing up, she said,

13   Reggie, when you make your bed, you gotta lie in it.  You can't

14   do dirt and then sweep it under the rug and act like it didn't

15   happen.  You can't do that.  You can't make this go away by

16   saying that you're sorry and you changed your ways.

17          And one of the things that I have to consider is whether

18   punishment is appropriate based upon what you did, and I

19   conclude that punishment is appropriate.

20          Then the question becomes, you know, what amount of

21   punishment is appropriate, and that's a hard issue to reach.

22          Also, you have to send a message, because I don't know if

23   this is going to happen again.  I think there are a lot of

24   people out there who are prepared to do the same thing and maybe

25   make it succeed next time, and especially when you've got the

people who riled folk up like you to do what you did who are
still riling folk up under the same false pretenses.

And I think there are a lot of people out there, I don't
know if that's you, who are prepared to replicate what took
place and even maybe be worse next time around.

So we're in trouble as a country.  We're in big trouble as
a country, because we've got too many people who want their way
on both sides, and because they want their way, they're willing
to do whatever it is to get their way.  That's not how a
democratic society operates.  That's a dictatorship.

And like I said, it's unfortunate that you've put yourself
in this position, but a message has got to be sent to you, but
even more so to other people, that if you're going to do what
happened that day, there have to be consequences.  And I know it
hurts, and that's unfortunate.  I hate to see people have to be
put in prison.  I mean, I consider prisons to be basically slave
camps, and I hate it.

But we have to have consequences, because if we don't hold
people responsible for what they do, then the attitude becomes,
you know, if I'm not going to pay a punishment for doing it, why
not do it.  Some people think that crime pays, because we are so
lenient what it comes to what we do when they do what they do.
And that just can't be.

So again, I have to look at what other people have
received, what type of sentences other people have received.

Those people who I've given the type of sentence your lawyer is asking, and she's done a marvelous job in representing you, have been people who were there, they went in, they didn't break anything.  Even if it was partially broken, they just went in, and when they got in, they did nothing.  Those people I've given the type of sentence your lawyer has requested.

But for those who have done more than that, I do think that some level of punishment is appropriate.  Again, the question is how much is enough.

And having thought through all of the things I have to consider, you know, it's sad that you now have this child in the world and you're not there to be with her, because I think fathers are very important in the life of a child.  I have a daughter, and I know how important I've been in her life in making her what she is.  And it's sad that you're not going to be available to her for a while, and that's the unfortunate situation that you put yourself in by doing what you did.

I also can't overlook the fact that at the time you committed this crime you had left the jurisdiction of Alabama against a court order that you not do so.  So, you know, the fact that the Court said, hey, you can't leave the state while this case is pending wasn't important to you.  You were going to do what you wanted to do because you felt so strongly about who you wanted to be in the White House.  So you said, hey, I'm not going to abide by what the Court told me, I'm going to do what I

1   want to do.  And that's a significant factor I consider also.

2       I could give you a lot more time than what I'm prepared to

3   give you, but I do take into account what's been happening in

4   reference to other individuals, and I think that it's important

5   to consider what other sentences have been meted out in these

6   types of cases, because I think that some level of consistency

7   is important in our criminal justice system.  But, you know, I

8   could justify giving you a ten-year sentence for what you did,

9   but I'm not going to do that.

10      But I am going to impose a sentence of 36 months in prison,

11  and I will order that you be given credit time for time that

12  you're entitled to receive that you served prior to the

13  imposition of this sentence.

14      And I will recommend that you be permitted to serve your

15  sentence at a location that's close to your home in Alabama so

16  that you can have some contact with your family while you're

17  serving your sentence.

18      I also will place on you supervised release for a period of

19  three years once you finish your prison sentence.  And as far as

20  your prison sentence is concerned, there's two different charges

21  that you're charged with.  So it's 36 months on each of those to

22  run concurrent with each other.

23      And also, in reference to Count 1, you are receiving a

24  three-year period of supervised release, and also a three-year

25  period of supervised release regarding Count 3.  Those also are

1    to run concurrent with each other, for a total of three years of

2    supervised release.

3         I will impose a restitution obligation in the amount of

4    $10,000.

5              MS. VACA:  Judge, and I apologize, I didn't object to

6    that part before.  The restitution amount, I had informed the

7    government counsel that the prior government counsel, Jennifer

8    Rozzoni, had sent me an estimate of the -- well, it's not really

9    an estimate.  It was how much it cost to fix the window that he

10   broke.  It was $1,500 for two windowpanes, and he had broken

11   one.  So she told me that he was no longer even at the felony

12   amount.

13        So I think there is a dispute on that restitution amount,

14   Your Honor, because that estimate is for window -- I'm not sure

15   what it actually is for, but the window that he actually broke,

16   I have the estimate.

17        I apologize, Your Honor.  I tried to --

18             THE COURT:  What's the government's basis for your

19   representation that it was $10,000 or $12,000, whatever it was?

20             MR. DIAMOND:  Your Honor, the monetary estimate comes

21   from the Architect of the Capitol.  Their paperwork cites not

22   just the -- defense counsel did show me something that referred

23   to the glass itself, but the estimate that I've seen from the

24   Architect of the Capitol seems to mention the windowpane, the

25   cleanup costs, and some other costs associated outside the cost

1  of the glass alone.

2     But Your Honor, I can't say more than that.  That's just

3  what I have from the Architect of the Capitol.

4       THE COURT:  Well, what I will do is I'm going to

5  impose the amount that the government requested in the amount of

6  $12,000 as restitution.  However, I will consider reducing that

7  amount if the government cannot present documents, documentary

8  evidence supporting that amount of restitution.

9     So I will require the government within 10 days of today's

10  date to submit to me in writing any estimates from the Architect

11  of the Capitol as to how much it cost to replace that window.

12       MR. DIAMOND:  Your Honor, on that point, the

13  government would note that this was provided to your chambers

14  yesterday.

15       THE COURT:  If it is provided, then I will read it --

16       MR. DIAMOND:  It's Exhibit 2, Your Honor.

17       THE COURT:  I will read it, and I will see if I agree

18  with it.

19     I don't know if you got a copy of that.

20       MS. VACA:  I do.  I was going to --

21       THE COURT:  If you want to submit something to me as

22  to why --

23       MS. VACA:  Yes, I will submit the estimate that I

24  received from the government.

25       THE COURT:  If you want to submit something to me that

refutes their representation that that amount should be awarded,

I will consider reducing it.

        MS. VACA:  Yes, Your Honor.  Thank you.

        THE COURT:  I said 10,000.  I meant to say $12,000

restitution obligation, subject to reduction based upon further

review of information already submitted to me and additional

information that may be submitted by defense counsel.

    As conditions, sir, of your supervised release once you are

released from your prison sentence, I will require that you not

commit any further criminal offenses while you are on

supervision.

    Also, I will require that upon your release you immediately

report to the Probation Department to let them know that you're

back in the community so that you can be supervised.

    I will recommend that your supervision -- I will maintain

jurisdiction over your case, but I will recommend that your

supervision be transferred, assuming the State of Alabama

accepts supervision, to the State of Alabama so that you can be

supervised in that location where I assume you will live once

you are released from your prison sentence.

    I also will require that you not possess any type of

illegal controlled substance, that you be tested periodically to

see if you are using drugs.  I will require that you be tested

mandatorily at least once 15 days upon your being placed on

supervision and then periodically at the discretion of the

1    Probation Department as they deem appropriate.

2         You are required by law to provide a sample of your DNA.

3    So if you're involved in further crime, that can be used to

4    identify you.

5         And I also will require that as a condition of your

6    supervised release, that you pay the restitution that I've

7    ordered and that you pay a minimum of $250 per month towards

8    that restitution until the entire amount has been paid.  If you

9    make late payments, then you will be subject to paying interest

10   and penalties for those late payments.

11        And your payments are to be made to the Architect --

12   actually, to be made to the Clerk of the Court, and the Clerk of

13   this Court will then forward that money to the Architect of the

14   Capitol to compensate the United States government for the

15   damage that was done.

16        The law does require also that you pay $100 to the court as

17   a special assessment, and I will require that that be paid.

18        In light of the financial obligations you have to pay

19   restitution, I will require that you provide any financial

20   disclosure of information that's requested by the Probation

21   Department so that they can assess your ability to pay the

22   amount of the restitution and the court costs; also that you not

23   create any new financial obligations without the authorization

24   of the Probation Department; also that you not do anything to

25   distort the drug tests that are going to be done trying to

1    assess whether you are using drugs.

2         I don't know if you're in need of drug treatment or not,

3    but I will require that if it's determined by Probation after an

4    evaluation that drug treatment is necessary, that you

5    participate in that drug treatment until such time as it has

6    been completed.

7         I don't see a recommendation of mental health treatment,

8    but I don't see anything that would maybe justify that, but if

9    it's determined by Probation that mental health intervention is

10   appropriate, that you do that.

11        Also, to further pay back the community for what you did, I

12   will require that you pay -- that you perform 100 hours of

13   community service and that you do that within 12 months of your

14   being placed on supervision and that you perform community

15   service at a rate of at least four hours per week in order to

16   complete that community service.

17        I also will, within 60 days of your release, conduct a

18   review of your supervision.  Since you're going to be,

19   hopefully, I assume, down in Alabama, I will permit those

20   reviews, which will be conducted in court, but I will permit you

21   to do those remotely from your home in Alabama if that's where

22   you're going to be living.

23        I also will not impose a fine, concluding that considering

24   the amount of restitution that you're being ordered to pay and

25   the other family obligations you're going to have, that you do

1    not have the capacity to pay a fine and, therefore, will not

2    impose a fine.

3         I will authorize the release of this report to the

4    appropriate entities, the presentence report, so that the orders

5    of the Court can be carried out.

6         You have 14 days from today's date to appeal your sentence

7    to the United States Court of Appeals for the District of

8    Columbia Circuit.  If you cannot afford to pay for a lawyer to

9    represent you or if you cannot afford to pay for the costs of

10   letting that court know that you want to appeal, those will be

11   paid free of charge by the government.

12        Anything else from government counsel?

13             MR. DIAMOND:  No, Your Honor.

14             THE COURT:  Anything else from Probation?

15             PROBATION OFFICER:  Your Honor, I just wanted to

16   confirm the special assessment is $200?

17             THE COURT:  I'm sorry.  It's $100 per charge.  So it's

18   $200 special assessment he has to pay to the court.

19             PROBATION OFFICER:  Thank you, Your Honor.

20             THE COURT:  Anything else from the defense?

21             MS. VACA:  Your Honor, is this where I would note my

22   objection?

23             THE COURT:  Yes.

24             MS. VACA:  Your Honor, for the record, I will object

25   to the sentence that was imposed as being substantively

1    unreasonable and, I think, procedurally unreasonable, and I will

2    explain why, and then I will talk to Mr. Watson later to see if

3    he would like to appeal.

4        But, Your Honor, in this case specifically, I think one of

5    the reasons the Court noted for its sentence is, you know, to

6    avoid unwarranted sentencing disparities.  I would note that

7    specifically this defendant received the same sentence as Dustin

8    Thompson even though the Court, in its reasoning earlier in

9    sustaining Mr. Watson's objections to the sentencing

10   enhancements, stated that Mr. Thompson, his conduct warranted

11   those enhancements.

12       And at this point, Your Honor, then, Mr. Watson would have

13   been or was at a guideline range of 10 to 16 months, and

14   therefore, I think in imposing sentence, the Court varied upward

15   substantially for Mr. Watson.

16       And I understand the Court's reasoning about the overall, I

17   guess, conduct.  However, I would say that for Mr. Thompson, who

18   put the Court through a trial and took the stand in light of the

19   trial and ultimately received a substantial downward variance

20   from the sentencing guideline that the Court found appropriate,

21   that Mr. Watson's sentence is procedurally and substantively

22   unreasonable, given those factors, Your Honor.

23       And I will advise Mr. Watson of his right to appeal.  I

24   just wanted to make the record clear for him to do so if he so

25   chooses.

1          THE COURT:  Very well.  Those objections are noted for

2     the record.

3          I would indicate that I actually consider his conduct to

4     be -- even though Mr. Thompson's guideline was higher, his

5     conduct to be actually worse than Mr. Thompson because of

6     several factors:  One, him cutting the covering on the

7     scaffolding that made it possible for individuals to gain access

8     closer to the entry into the Capitol; also him further breaking

9     out the window, which made it possible for the flood of people

10    to increase coming into the Capitol; and also, even though he

11    says he was intoxicated at the time he made the statement, the

12    fact that he did, in fact, shortly before these events took

13    place make statements indicating his desire to kill the

14    President of the United States.

15         And all of those factors, in my view, justify a sentence

16    above the top of the guidelines, even though I concluded that

17    the enhancements that the government's requested were not

18    appropriate based upon the facts of this case.

19         MS. VACA:  Yes, Your Honor.  I understand.

20         THE COURT:  Thank you.

21         COURTROOM DEPUTY:  Government counsel, the remaining

22    counts, please move to dismiss them.

23         THE COURT:  I understand there's some counts that the

24    government needs to dismiss?

25         MR. DIAMOND:  Yes, sir, Your Honor.  The government

1    moves to dismiss all remaining counts.

2              THE COURT:  I assume there's no objection.

3              MS. VACA:  No objection, Your Honor.

4              THE COURT:  Very well.  Motion granted.

5         (Proceedings adjourned at 12:11 p.m.)

1       CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Sara A. Wick, certify that the foregoing is a

4       correct transcript from the record of proceedings in the

5       above-entitled matter.

6

7

8

9       /s/ Sara A. Wick                    April 20, 2023

10      SIGNATURE OF COURT REPORTER         DATE